Paul F. DELISLE, Plaintiff–Appellant,

v.

BRIMFIELD TOWNSHIP POLICE
DEPARTMENT, et al.,
Defendants–Appellees.

No. 02–3050.

United States Court of Appeals,
Sixth Circuit.

March 8, 2004.

John F. Myers, Holland, Myers & Myers, Akron, OH, for Plaintiff–Appellant.

Gregory A. Beck, Baker, Dublikar, Beck, Wiley & Mathews, North Canton, OH, for Defendants–Appellees.

Before KEITH, BATCHELDER and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Plaintiff, Paul F. Delisle, appeals from the order entered by the district court granting summary judgment in favor of Defendants, Brimfield Township Police Department, its former Chief, Robert Burgess, and, the Brimfield Township Trustee Board ("Trustees"), thereby dismissing Plaintiff's allegations of denial of his First and Fourteenth Amendment rights to religious freedom; religious discrimination and retaliation claims filed pursuant to Title VII, 42 U.S.C. § 1983, and the Ohio Rev.Code Ann. § 4112.02(A). For the reasons that follow, we REVERSE the district court's entry of summary judgment.

## I.

Plaintiff was hired as one of the original five Brimfield Township Police Department patrol officers when the department was formed in 1988. Plaintiff was subsequently promoted to sergeant in 1992 and to lieutenant in 1995. As lieutenant, Plaintiff was second in command of the police department, and reported to Defendant Chief Robert Burgess. Plaintiff served as lieutenant until December 2, 1999 when he was demoted to patrol officer by an unanimous decision of the Trustees. Until February of 1999, no formal disciplinary action had been taken against Plaintiff; and Plaintiff had only received minimal negative feedback regarding his job performance. According to Plaintiff's current supervisor, Chief Dave Thomas, Plaintiff's job performance was the same after February of 1999.

Defendant Burgess began his employment with the department in 1987, and was promoted to sergeant, captain, and ultimately to chief in 1995. Burgess is a member of the Liberty Baptist Church, where he has performed duties as an associate pastor and Sunday school teacher. Plaintiff, raised in the Catholic church, began attending Burgess' church soon after he was hired as a patrol officer. After the relationship between Plaintiff and Burgess deteriorated, Plaintiff began attending a different Baptist church.

Plaintiff claims that he began to notice a change in Burgess' workplace behavior in late 1998. While Plaintiff was on medical leave from the Department from late 1998 until February 18, 1999, Burgess called a mandatory meeting on December 4, 1998. Burgess admitted that the purpose of the meeting was to correct a "morale" problem within the department, purportedly caused by Officer David Blough's social involvement with Officer Robert Scherer's former

fiancee.[1] Plaintiff contends that officers who attended the meeting, including Plaintiff, were offended by Burgess' biblical references, and felt the meeting was designed to humiliate Officers Blough and Scherer.

In a meeting between Plaintiff and Burgess in February of 1999, Plaintiff claims that Burgess called him a "Judas" because he did not speak up at the December 4, 1998 meeting in support of Burgess, which Burgess disputes. Plaintiff also claims he told Burgess that he thought Burgess handled the meeting unprofessionally and not as a Christian. At the end of that meeting, Burgess informed Plaintiff that the administrative staff had been given pay raises by the Trustees and that Plaintiff had gotten $1,000 less than Sergeant Thomas. Burgess claims that he told Plaintiff, "I don't give the pay raises. I have no authority to make the pay raises. I bring a suggestion to the Board."[2] Plaintiff claims he then met with Trustee Stephen Moore to talk with him about the reduction in the pay raise.

On the day Plaintiff returned from medical leave, February 19, 1999, Burgess asked Plaintiff out to lunch. Plaintiff claims that Burgess wanted to begin their lunch with a Bible reading and a prayer, but Plaintiff refused. Burgess then allegedly again referred to Plaintiff as a Judas. Burgess also allegedly expressed anger at Plaintiff for not taking a stand against the "evil in the police department."

Later that afternoon, Burgess hand-delivered to Plaintiff an exceptionally unfavorable job evaluation; the worst he had ever received. The evaluation covered the time period from July of 1998 to December of 1998. This was an unscheduled evaluation, written on a form that had never been used in the police department, stating that Plaintiff was not meeting the expectations of his assignment and experience level. Plaintiff disputed the assertions in the evaluation, pointing out that for a portion of the evaluation period he was on medical leave.

Plaintiff claims that during 1998, Burgess frequently talked about religion in the workplace. Plaintiff claims that Burgess' religious workplace conduct got to a point where it became so overzealous that other officers complained, and Plaintiff in turn complained to Burgess. Burgess denies receiving such complaints.

Thereafter, on July 20, 1999, Plaintiff again contacted Trustee Moore to ask what the procedures were that would enable Plaintiff to talk to Moore about "police department matters." Moore informed Plaintiff that he must first direct the matter to Burgess, and then submit a request to speak to the Trustees, in writing, and send it to Burgess. The next day, Burgess called Plaintiff into his office and demanded to know why Plaintiff wished to speak to the Trustees. Plaintiff stated that he wished to address matters to the Trustees that he had previously tried to discuss with Burgess. Plaintiff refused to answer any more of Burgess' questions and instead pulled a tape recorder from his pocket, turned it on, and said, "No, I

---

1. Defendant Burgess was upset when Blough, who had left his wife and moved in with Scherer's former fiancee, refused to submit his change in address for his personnel file as required by Township policy. After lying to Burgess several times about whether he had moved, Blough finally admitted that he had moved in with and impregnated the woman he was seeing. According to Blough, Burgess stated that Blough was "playing on Satan's playground."

2. Burgess does, however, admit that when he discovered that Plaintiff had gone behind his back and complained to the Trustees, he told Plaintiff, "[t]he only thing missing here is the thirty pieces of silver," referring to Plaintiff's alleged betrayal of Burgess.

intend to speak to [Trustee] Moore at this point." Burgess admits that Plaintiff told him that he believed his civil rights were being violated and he had hired an attorney.

By letter dated July 23, 1999, Burgess informed the Trustees that Plaintiff had become blatantly disrespectful and insubordinate, and was unwilling to adhere to the chain of command. In the letter, Burgess claimed that he called Plaintiff into his office to address any grievance that Plaintiff may have had; but Plaintiff refused. As a result of this behavior, Burgess issued two three-day suspensions against Plaintiff, one for failing to follow orders and the chain of command, and the second for failure to satisfy the grievance procedure and insubordination through threats and refusal to obey orders. Plaintiff appealed the suspensions to the Trustees, which the Trustees unanimously approved.

Plaintiff claims that on September 23, 1999, Brimfield Township Clerk, Charles Sprague, told him, "If you don't have an attorney, you better get one. Burgess is looking to fire you." On September 27, 1999, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on religion and retaliation.

By letter dated October 26, 1999, the Trustees informed Plaintiff that they expected him to "communicate with your subordinates in a manner that reflects your respect and commitment to Chief Burgess and the Department.... If you are unable to meet the Board's expectation, then it may be in your best interest to reconsider your role within the department...."

On November 18, 1999, Burgess sent a letter to the Trustees outlining his problems with Plaintiff, including Plaintiff's attitude and animosity. Burgess noted that Plaintiff would not talk to the administrative staff, but would only communicate in writing. His actions, Burgess claimed, impeded the fundamental operations of the police department. On or about, December 1, 1999, Plaintiff was demoted by the Trustees upon the recommendation of Burgess for poor performance and insubordination, and Plaintiff's pay and position were reduced to that of patrol officer. Moore admits that the Trustees instructed Burgess to "build a file" on Plaintiff to support his demotion.

Plaintiff was issued a right to sue letter from the EEOC and filed a complaint in the district court alleging employment discrimination on the basis of religion and retaliation. The district court granted summary judgment in favor of Defendants holding that Plaintiff failed to make out a *prima facie* case under Title VII because he was not a member of a protected class, and lacked the evidence to sufficiently establish the necessary causation for his retaliation claim. Plaintiff's § 1983 claim was analyzed as a First Amendment retaliation claim, with the court deeming Plaintiff's speech not a matter of public concern, thus warranting summary judgment in Defendants' favor.

## II.

This Court reviews a district court's grant of summary judgment *de novo. Johnson v. University of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000). A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *see also United Nat'l Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). When deciding whether summary judgment is proper, we must view

the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the moving parties, Defendants in this case bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, as the non-moving party, must then present sufficient evidence from which a jury could reasonably find for him. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because we find that Plaintiff has set forth a *prima facie* case for both retaliation in violation of Title VII[3] and First Amendment retaliation under 42 U.S.C. § 1983, and has also raised several genuine issues of material fact, we reverse the district court's grant of summary judgment in favor of Defendants. Much of the evidence presented in this case to fulfill the requirements of properly pleaded retaliation claims under Title VII and § 1983 require credibility determinations more suitable for a jury than this Court. Where the basis of a plaintiff's claim can only be proven through the resolution of disputed facts, this Court must remand. *Duggins v. Steak 'N Shake, Inc.,* 195 F.3d 828, 833 (6th Cir.1999).

## A. Plaintiff's Title VII Retaliation and Ohio Civil Right Act Claims[4]

Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reason-

ably believes constitutes a violation of Title VII. *Johnson,* 215 F.3d at 579. In the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *Weigel v. Baptist Hosp.,* 302 F.3d 367, 381 (6th Cir.2002) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In order to survive summary judgment on a Title VII retaliation claim a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the exercise of his protected rights was known to the defendant; (3) the defendant consequently took an employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Fenton v. HiSAN, Inc.,* 174 F.3d 827, 831 (6th Cir.1999). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp.,* 411 U.S. at 802). The plaintiff may then seek to rebut the defendant by demonstrating that the articulated reason was a mere pretext for discrimination. *Id.* (citing *McDonnell,* 411 U.S. at 804).

The scope of our review of Plaintiff's retaliation claim includes Plaintiff's demotion in December of 1999, and two of Plaintiff's back-to-back 3–day suspensions. We are able to review the breadth of Plaintiff's Title VII claim even though Plaintiff's two back-to-back 3–day suspensions, but not Plaintiff's demotion, were the only claims

---

**3.** Plaintiff does not appeal the district court's ruling on his religious discrimination claim.

**4.** The district court is correct in its analysis that "federal case law interpreting Title VII ... is generally applicable to cases involving

alleged violations of OHIO REV. CODE ANN. § 4112." (citations omitted). Therefore, Plaintiff's state and federal claims will be analyzed together.

included in the previously filed EEOC claim; and this Court's ability to do so is not thwarted because Plaintiff's demotion was omitted from Plaintiff's original administrative claim.

### 1. Adverse actions properly before this Court

Several circuits have allowed adverse actions that have occurred subsequent to an administrative filing, and carried out in retaliation for the plaintiff's performance of a protected act, to be reviewed for the first time in the district court if the retaliation claim is " 'reasonably related' to [the claims] that the plaintiff did assert before the agency." *Fitzgerald v. Henderson,* 251 F.3d 345, 360–61 (2d Cir.2001); *see also Anjelino v. The New York Times CO.,* 200 F.3d 73, 96 (3d Cir.1999) (reversing the lower court's dismissal of the plaintiff's retaliation claim for failure to exhaust, since there were numerous related allegations of discrimination already in the record, citing *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3rd Cir. 1984) (holding that the plaintiff's "new retaliation claim may fairly be considered [an] explanation [ ] of the original charge"): and *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–99 (3d Cir.1976) (stating that the "parameters of a civil action in the [d]istrict [c]ourt are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charges of discrimination, including new acts which occurred during the pendency of proceedings before the Commission")); *White v. New Hampshire Dep't of Corrections,* 221 F.3d 254, 262 (1st Cir.2000) (properly reviewing a Title VII retaliation claim based on retaliatory actions that occurred after an administrative claim was filed with the EEOC); *Butts v. The City of New York Dep't of Housing Preservation and Development,* 990 F.2d 1397, 1401–03 (2d Cir.1993) *rev'd on other grounds.* (ex-

plaining the three situations in which a district court has jurisdiction to hear claims not alleged in an EEOC charge which are sufficiently related to the allegations in the complaint before the court: (1) an allowance of loose pleadings by a plaintiff who has most likely filed an EEOC charge without the benefit of counsel, where the conduct complained of would fall "within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) an allegation of retaliation by an employer against an employee for filing an EEOC claim, where there is a "close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself;" and (3) where a plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.").

The dissent relies on *Nat'l. R.R. Passenger Corp. v. Morgan* 536 U.S. 101, 109–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), for the proposition that this Court lacks the jurisdiction to hear claims of retaliatory acts that may have occurred subsequent to a plaintiff's administrative filing; however, that is not the proposition for which *Morgan* stands. To date, two federal courts have had the opportunity to address similar issues and found that such reliance on *Morgan* to support a denial of plaintiff's claim of an adverse action subsequent to an administrative filing is misplaced. *Higbee v. Billington,* 246 F.Supp.2d 10, 16–17 (D.D.C.2003) (stating plaintiff's reliance on *Morgan* is misplaced. *"Morgan* deals with the timeliness of the administrative complaints that were made and not with whether the failure to file an administrative complaint should be excused."); *see also Doan v. NSK Corp.,* 266 F.Supp.2d 629, 636 n. 2 (E.D.Mich.2003) (*"Morgan* addressed the issue of whether an EEOC charge is timely.... *Morgan* does not

address the issue here, which is whether a federal court has jurisdiction to hear claims that are not explicitly included in an EEOC charge:" denying plaintiff's subsequent adverse action on separate grounds, i.e., they were not "reasonably expected to grow out of [the original EEOC claim].").

In *Morgan,* the Supreme Court reversed the Ninth Circuit's holding on the "continuing violation doctrine, which 'allow[ed] courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice.'" 536 U.S. 101, 107, 122 S.Ct. 2061, 2069, 153 L.Ed.2d 106 (2002) (internal quotations omitted). There, however, the plaintiff asserted a "continuing violations" defense in order to qualify some of the allegedly discriminatory acts about which plaintiff complained, which did not take place within the 300 day time period before the filling of plaintiff's EEOC claim, but rather took place *prior* to this time period. *Id.* at 106. *Morgan* clarified and limited the scope of all courts' abilities to apply the continuing violations doctrine to cases where plaintiff's discriminatory allegation span further back than the 300 day time frame prior to filing the administrative charge. Nevertheless, we are not addressing a continuing violation defense here. Plaintiff before us is not looking to raise the issue of retaliatory acts that may have occurred prior to his filing of his EEOC claim that are statutorily time-barred. That was the issue in *Morgan,* and hence *Morgan's* holding. *Id.* at 109 (reiterating that the Court should "strict[ly] adhere[ ] to the procedural requirements specified by the legislature ..." and noting that "'[b]y choosing what are obviously short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination.'") (internal citations omitted).

When taken out of context, *Morgan* may appear to address the issue we have before us; however, the dissent's application of the *Morgan* holding to the facts of this case is completely inapposite. *Morgan* also makes clear what discrete acts of discrimination or retaliation will not be heard if they occurred prior to the 300 day period leading up to an administrative filing. This clarification, however, buttressed the plaintiff's argument that the statute did not "require the filing of a charge within 180 or 300 days of each discrete act, but that the language requires the filing of a charge within the specified number of days after an 'unlawful employment *practice.*' 'Practice,' [plaintiff] contends, connotes an ongoing violation...." *Id.* at 110. Again, the Court took issue with plaintiff's defense of a "continuing violation" for acts that occurred prior to the statutory time period, suggesting, again, the Congressional intent with respect to the time limits: "to encourage prompt processing of all charges of employment discrimination." This is a separate issue, not contemplated by the facts before us.

This Court has not yet addressed such distinctions suggested by the dissent in light of *Morgan;* however, there is no precedent precluding this Court from the review of such subsequent adverse actions. The dissent aptly states that this Court has not "flagrant[ly] disob[eyed]" the Supreme Court's holding in *Morgan,* when issuing *Weigel,* 302 F.3d at 379–380. Of course we have not, flagrantly or otherwise—hence our reliance on *Weigel* today. *Weigel* reiterates this Court's contention that we "do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." 302 F.3d at 379–80 (citing *Strouss v. Mich. Dep't of Corr.,* 250 F.3d 336, 342 (6th Cir.2001)). Although *Weigel*

does not address retaliatory actions that have occurred subsequent to administrative filings, it does, however, concern retaliation claims not alleged in an administrative filing that may be reviewed so long as they could "reasonably [be] expected to grow out of the [existing] EEOC charge." *Weigel*, 302 F.3d at 379–80. The court in *Weigel* also stated, given the allowable scope of an EEOC investigation, " 'retaliation naturally grows out of an underlying substantive discrimination claim foreseeable to defendants.' " *Id.* (internal citation omitted). Again, the dissent suggests the majority opinion is in derogation of this Court's precedent and Supreme Court precedent; however, there is no legal precedent that precludes this Court from considering Plaintiff's subsequent adverse action based on the facts before us; and additionally, case law in our Circuit supports our theory behind the policy of recognizing retaliatory adverse actions not previously administratively filed.

■ In the instant action, Plaintiff has alleged constitutional and statutory violations resulting from two related adverse employment actions: Plaintiff's six day cumulative suspension; and his ultimate demotion from lieutenant to patrol officer. This Court will not discount Plaintiff's second allegation of retaliation in the form of his demotion since it occurred subsequent to Plaintiff's filing of his administrative claim, and Plaintiff did not file an additional administrative claim. Given that the administrative exhaustion requirement's purpose is, at least in part, to put potential defendants on notice while giving the EEOC the opportunity to investigate and, if possible, to mediate claims, in this situation the EEOC would have already had the opportunity to investigate, making a second filing unnecessary. *Butts*, 990 F.2d at 1402 (stating that "due to the very nature of retaliation, the principle benefit of EEOC involvement, mediation and claims of conciliation, are much less likely to result from a second investigation"). Therefore, this Court should be permitted to review the full scope of Plaintiff's retaliation claim, inasmuch as both actions are reasonably related. *Id.* ("[R]equiring a plaintiff to file a second EEOC charge [for retaliation after an initial administrative claim has been filed] could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination.").

### 2. Merits of Plaintiff's Title VII claims

Plaintiff argues that his complaints to both Burgess and the EEOC regarding Burgess' alleged religious discrimination constituted protected activity and began as early as December 1998. The district court, however, found that Plaintiff's EEOC complaint, filed on September 29, 1999, was the first notice to Defendants of Plaintiff's complaints of religious discrimination. Additionally, the district court found that none of Plaintiff's written communications to Burgess complained of religious discrimination, and that during the appeal of his suspensions, Plaintiff did not disclose to the Trustees that he was being discriminated or retaliated against on the basis of his religion.

Nevertheless, Plaintiff's deposition testimony indicates that Plaintiff complained of religious discrimination to Burgess and Moore in an informal manner shortly before his disciplinary problems began in February of 1999.[5] (J.A. at 278.) Bur-

---

5. It is true that Plaintiff's claim of an unscheduled, negative evaluation of his job performance in February 1999 cannot be asserted at this point as one of Plaintiff's adverse actions, since that claim was not initially included in the complaint. This fact, however, like any

gess, however, denies that Plaintiff informed him of Plaintiff's objections to workplace religious conduct. (J.A. at 477–78.) Given that most of the conversations between Plaintiff and Burgess occurred to the exclusion of others, it would be improper for this Court to make credibility determinations by automatically discrediting all of the evidence put forth by Plaintiff, while accepting all evidence put forth by Defendant, particularly where Defendant's evidence is no more persuasive than Plaintiff's.

■ In suggesting that this Court recognize that Plaintiff has, in fact, raised genuine issues of material fact, we do so with the understanding that to withstand summary judgment the non-movant must present sufficient evidence to create a genuine issue of material fact, *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990), while noting that a mere scintilla of evidence is insufficient, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202,(1986). Here, however, Plaintiff has demonstrated that there may have been a causal connection between both adverse actions and Plaintiff's protected activity, evidenced by general hostility exhibited toward Plaintiff only after opposing Burgess' religious speech, which is indicated by the following facts: (1) the very same day Plaintiff made his first informal complaint to Burgess about his religious conduct during the December 4, 1998, meeting, Burgess informed Plaintiff that his scheduled pay raise would be reduced by $1,000 and delivered to Plaintiff his first unfavorable performance review (J.A. at 284–87); (2) Burgess, following Plaintiff's first informal complaint to

Moore, repeatedly approached the Trustees and requested permission to fire Plaintiff (J.A. at 130–31); (3) Plaintiff had no significant disciplinary record or performance shortcomings for the eleven-year period preceding his first informal complaint to Burgess, (J.A. at 280–81, 598–99); (4) the Trustees failed to remedy the situation after Plaintiff made an informal complaint to Trustee Moore (J.A. at 598); and (5) within two months of the filing of his EEOC complaint, Plaintiff was demoted. (J.A. at 309.)

Furthermore, this Court cannot rely on the Trustees' knowledge of Plaintiff's complaints regarding religious discrimination, or lack thereof, prior to Plaintiff's two back-to-back 3–day suspensions, as a basis to reject Plaintiff's allegations of pretext. A lack of evidence of the Trustee's knowledge of Plaintiff's comments and complaints to Burgess regarding his religious use of the workplace should not be fatal to Plaintiff's defense of Defendants' summary judgment motion. This is particularly so when the record establishes that Burgess, who suspended Plaintiff for alleged "insubordination," was the supervisor who had been invested by the Trustees with the responsibility of managing the police department, and was also the individual allegedly engaged in making inappropriate religious comments. Based on the above record evidence, Plaintiff claims that the Defendants' alleged non-discriminatory "insubordination" explanation for the suspension was, in fact, pretextual. The stated reason for Plaintiff's need to speak with the Trustees regarding the problems he had with Burgess was Plaintiff's frustration over Burgess' failure to respond to Plaintiff's previous complaints. (J.A. at

---

other fact asserted to bolster Plaintiff's claim of a causal connection between the exercise of his protected activity and the subsequent retaliatory acts, serves as additional evidence of the retaliation, while demonstrating that there

was additional hostility directed towards Plaintiff between his first complaint in December 1998 and the adverse action of suspension in July 1999.

290–91.) According to deposition testimony, Plaintiff stated to Trustee Moore that all of the issues he wished to bring before the Trustee Board had already been addressed with Burgess, to no avail, including "[t]he way the Chief was handling the officer, the constant hounding on religious matters." *Id.*

The record cites one conversation, in particular, between Plaintiff and Burgess that demonstrates a causal connection between Plaintiff's protected activity and the adverse actions alleged by Plaintiff, where Plaintiff expressed his displeasure with Burgess religious proselytizing. (J.A. at 108.) Additionally, the facts in the record demonstrate that the relationship swiftly deteriorated between Plaintiff and Burgess, beginning shortly after Plaintiff's initial criticism of Burgess' constant use of religious speech at work. (J.A. at 278.) Plaintiff has set forth the proper causal connection, which, contrary to the findings of the district court, is not merely based on temporal proximity. In assessing the facts of this case, this Court cannot simply interpret the conversations between Plaintiff and Defendant to merely indicate Plaintiff's disenchanted view of Burgess' management style, when record evidence exists that establishes Plaintiff was adversely affected after his criticism of Burgess' workplace religious conduct. This Court must view all of the relevant allegations in their totality, which include the conversations and actions by Burgess leading up to Plaintiff's suspension. It is clear that disputed factual issues exist. As to their materiality, this Court may look no further than *Duggins*, where this Court emphasized its purpose in reviewing a grant of summary judgment, stating that when looking to the issue of whether a plaintiff's retaliation claim can withstand summary judgment the Court is not "speaking to the merits of [the] case," but merely determining whether the plaintiff's alleged facts,

even when coming from affidavits, make out an adequate case for retaliation. 195 F.3d at 833.

■ With regard to Plaintiff's demotion, there is proof of discriminatory animus by the Trustees that resulted in an adverse action; even though Defendants claim the Board was never made aware of Plaintiff's religious discrimination dispute or claims of retaliation by Burgess. As previously stated, this Court cannot chose to interpret the record so as to identify which facts a reasonable jury should believe, but must instead view the facts in the light most favorable to the non-movant. Nevertheless, even if we chose not to believe that Plaintiff made the Trustees aware of Plaintiff's previous disputes with Burgess regarding Burgess injecting his religious views into his management of the department, the alleged discriminatory remarks made by Burgess to Plaintiff are still relevant when determining the causal connection between alleged discriminatory acts and adverse employment actions. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir.1998) (reversing defendant's grant of summary judgment by determining in the affirmative that a reasonable jury could conclude that the then vice president was in a position to influence the alleged decision to deny the plaintiff opportunities within the company). This Court will take into account those instances where an individual did not "independently have the authority or did not directly exercise their authority to fire [or demote] the plaintiff, but who nevertheless played a meaningful role in the decision to terminate [or demote] the plaintiff." *Id.; see also Wells v. New Cherokee Corp.*, 58 F.3d 233, 237–38 (6th Cir.1995). There is record evidence that the majority, if not all, of the Trustees' knowledge of the alleged reasons for Plaintiff's demotion came directly from Burgess and included Bur-

gess' claims of Plaintiff's alleged insubordination. (J.A. at 597–600.)

Moreover, even if Plaintiff's claims of religious discrimination were ultimately legally unsound, in looking at the causal connection between retaliatory acts and adverse actions, several circuits have confirmed that activity opposing discriminatory conduct is protected even when it is based on a mistaken good faith belief that Title VII has been violated. *Love v. RE/ Max of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984) (citing several other circuits). Therefore, even if Plaintiff's original allegation of religious discrimination was invalid, Plaintiff's deposition testimony demonstrates that he had a good faith belief that Burgess was violating his constitutional right to religious freedom in the workplace and Plaintiff asserted that right in the form of informal complaints to both Burgess and Trustee Moore, and in a formal EEOC claim.

### B. Plaintiff's First Amendment Retaliation Claim

Plaintiff also alleges First Amendment retaliation, because his speech addressed a matter of public concern when expressing the concerns of subordinate employees with regard to the manner in which Burgess permitted his religious beliefs to permeate the workplace and dictate the manner in which Burgess disciplined employees. (Plaintiff's Brief at 44). In determining whether a public employer has violated the First Amendment by adversely effecting a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. *See Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983). First, a court must ascertain whether the relevant speech addressed a matter of public concern. *Id.* If the answer is yes, then the

court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

■ Plaintiff correctly argues that his speech went beyond criticism of Burgess' management style insofar as Plaintiff's speech was an attempt to stand up for both himself and other subordinate employees who felt their civil rights were being violated by Burgess' religious workplace conduct. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 n. 8 (6th Cir. 1995) (listing cases where this Court held that certain statements in the workplace did or did not address matters of public concern); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 576–79 (6th Cir. 2000) (recognizing that a public employee's advocacy of its institution's affirmative action program on behalf of the rights of the minority employees to be a matter of public concern).

■ Once Plaintiff's speech as a public employee is determined to be protected, this protected speech must be weighed and balanced against Defendant's interest in "performing its function efficiently." *Leary v. Daeschner*, 349 F.3d 888, 899–900 (6th Cir.2003). In *Leary*, this Court held two public school teachers' speech, criticizing matters of student discipline and the implementation of appropriate educational

programs, to be protected and not outweighed by a school district's interest in its own efficiency due, in part, to the fact that such speech was a matter of public concern because it regarded the operation of the public school system; and occurred in private, so it was not a disruptive force or impediment to the school's efficiency. *Id.* (citing the same case previously before this Court, at *Leary v. Daeschner,* 228 F.3d 729, 738 (6th Cir.2000)). Here, the district court ruled that Plaintiff was demoted because "he was not functioning effectively as a lieutenant and was in fact impeding the operations of the department." Again, we have a scenario where many of the conversations regarding Burgess' religious speech and alleged retaliation against Plaintiff were strictly between Plaintiff and Burgess. The record evidence that states the reasons for Plaintiff's suspension and ultimate demotion were issued by the Trustees based on information from Burgess. In viewing the facts in the light most favorable to the Plaintiff, Plaintiff's voicing of his concerns did not seem to interfere with the orderly operation of the department. Plaintiff's protected speech was thereby not disruptive, nor did it prohibit the department from functioning efficiently; or at least no less efficiently than was permitted by Burgess' alleged religious management style.

Additionally, if we deem Plaintiff's speech protected, Plaintiff still must demonstrate that the adverse actions taken against him were motivated, at least in part, by the exercise of his constitutional rights. *Mt. Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287. This Court has previously held that plaintiffs' final showing of proof, that "their protected speech was a substantial or a motivating factor in the adverse action," before the burden shifts to the defendant, is "a question of fact because it involves whether to believe [Defendants'] evidence on the reasons for

Plaintiff's [adverse action] or whether to believe Plaintiff's contrasting evidence on the reasons for [the adverse action]." *Leary,* 349 F.3d 888 at 900–02. Here, as in *Leary,* we conclude that "Plaintiff's evidence that [his two back-to back three day suspensions and subsequent demotion] were motivated by [Plaintiff's] protected speech, while not overwhelming, is more than a scintilla and is sufficient to survive a motion for summary judgment." *Id.*

Therefore, this court REVERSES the district court's grant of summary judgment to Defendants and REMANDS for further proceedings not inconsistent with this opinion.

BATCHELDER, Circuit Judge, Dissenting.

Because plaintiff failed to file a complaint with the EEOC after he was demoted, I would have dismissed for lack of jurisdiction the plaintiff's Title VII claims based upon his demotion. Likewise, with respect to the remainder of his claims, I would have affirmed the judgment of the district court. Therefore, I respectfully dissent.

## I.

Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3. In order to show a violation of this section, a plaintiff bears the burden of proving that

(1) [ ]he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse em-

ployment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000). If the plaintiff can make out a prima facie case, the burden of proof shifts to the defendants "to articulate some legitimate, non-discriminatory reason for" their actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendants do so, the plaintiff is then required to show that the defendants' articulated reasons are no more than a pretext for discrimination. *Id.* at 804.

With respect to the two back-to-back 3–day suspensions that Delisle received, purportedly for insubordination, Delisle claims that Burgess suspended him in retaliation for his attempt to communicate with Burgess's superiors regarding Burgess's alleged workplace discrimination. However, the record contains no evidence that Delisle attempted to raise to the Trustees any complaints of either religious discrimination or anti-union animus on the part of Burgess. Delisle points to his meeting in early 1999 with a Township Trustee soon after Delisle received a smaller raise than Sergeant Thomas. He recalls the conversation as follows:

And I said, I don't know how to open this conversation, but I don't want to appear like I'm violating any kind of chain of command, but I have some concerns over this pay raise issue. And we got into the conversation that Burgess had recommended those pay raises, that Burgess said I wasn't doing my job, that Thomas was his right-hand man, and if he could make Thomas Captain tomorrow, he would have.

It is clear that Delisle was upset about his pay raise, but he did not mention any concern about religious discrimination or anti-union activity by Burgess. In fact, when Delisle confronted Burgess about the way Burgess conducted a meeting, Delisle told Burgess that the latter had acted "unprofessionally and not as a Christian. I wouldn't have handled it that way." Far from complaining about Burgess's use of religion in the workplace, Delisle "used religion" to make his point to Burgess.

The record does indicate at one point that in connection with Delisle's concerns about Burgess's management style, Delisle had direct discussions with Burgess on the subject of Burgess's use of religion in the workplace:

Q: So sometime in 1998 you and Chief Burgess started having a disagreement as to how to manage the department?

A: Manage personnel.... Yeah, the management of personnel was a little strained, I guess.

Q: And had you talked to him at this time about concerns that some of the officers had shared about the preaching?

A: Yes, I had several times.

Q: And what was his response to this?

A: He was to be a witness for Christ, and he was going to continue being a witness because part of his beliefs were to win souls and he was going to continue to be a witness.

These conversations with Burgess took place in 1998. at least nine months prior to Delisle's suspensions for insubordination.

I can find no evidence in the record that when the relationship between Delisle and Burgess was at its lowest point, Delisle complained about Burgess's "preaching" at

work, either to Burgess or to the Trustees. In fact, Delisle admittedly refused to tell Burgess what was wrong at the meeting between the two men that precipitated the suspensions. When he appealed his suspensions to the Township Trustees, he did not mention religious discrimination. As the district court properly noted, "[N]one of Plaintiff's letters or written communications to Burgess or any written or spoken communications from Plaintiff to the Trustees complained of the alleged religious discrimination." Even if Delisle has presented more than a scintilla of evidence that he was engaged in activity protected by Title VII because he did complain to Burgess about Burgess's moralizing in the office, I think it clear that he has not shown "a causal connection between the protected activity and the adverse employment action." *Morris v. Oldham County Fiscal Court*, 201 F.3d at 792. Moreover, the record contains no evidence that the Trustees even knew of the protected activity at the time of the suspensions. Because I think Delisle has failed to make a case with respect to his Title VII claim (and, hence, his state law claims) arising from his suspensions and he has likewise failed to present evidence that he was subject to a hostile work environment on account of any protected activities, I cannot join the majority opinion.

## II.

Delisle also alleges that the defendants violated Title VII by retaliating against him for filing his EEOC complaint in September 1999, and points to his demotion in December 1999 as support for his claim. Delisle's demotion was a discrete occurrence for which Delisle was required to file a separate EEOC complaint in order to claim now in federal court that the demotion violated Title VII, and we therefore lack the jurisdiction to consider any Title VII claim arising from that demotion. *See*

42 U.S.C. § 2000e–5; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Weigel v. Baptist Hosp.*, 302 F.3d 367, 379 (6th Cir.2002).

The Supreme Court unequivocally barred the very rationale the majority opinion relies upon to permit this claim:

Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [A plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period. While [the plaintiff might allege] that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through ... the date that he was fired, only incidents that took place with the timely filing period are actionable.

*Morgan*, 536 U.S. at 114. The majority opinion purports to rely on two district court cases for the proposition that courts have followed "such reliance on *Morgan* to support a denial of plaintiff's claim of an adverse action subsequent to an administrative filing is misplaced." Its attempt to buttress this assertion notes our prior case of *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 379–80 (6th Cir.2002). Yet the proposition for which the majority opinion cites *Weigel* is inapposite. The majority opinion claims that a specific and discrete adverse action which may "reasonably grow" out of the original EEOC claim, but for which no EEOC charge was filed, may be reviewed by this court. *Id.* This reliance misunderstands our holding in *Weigel:*

[The Defendant in *Weigel* ] asserts that Weigel's retaliation claim should be

dismissed because she did not allege retaliation in the charge she filed with the EEOC. "It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). On her EEOC charge, Weigel checked a box indicating discrimination based upon "Age." but did not check the box marked "Retaliation."

＊    ＊    ＊    ＊    ＊    ＊

Since the employer's articulation of its nondiscriminatory reason for taking a challenged adverse employment action is an essential step in any discrimination investigation, this claim clearly seems to be within the scope of any EEOC investigation expected to grow out of Weigel's discriminatory hiring claim. Moreover, Weigel's EEOC charge included facts relating both to [the defendant's] refusal to rehire Weigel and to the allegedly discriminatory treatment she received while previously employed [with defendant].

*Weigel*, 302 F.3d at 379–80. As is apparent when reading the complete quotation, we did not hold, in disobedience of the Supreme Court's holding in *Morgan*, that an EEOC charge which grows out of a prior one can somehow toll a claim that would otherwise be time barred. Instead, we were addressing a theory, namely, retaliation, which was not raised in the EEOC charge yet fell within the scope of an EEOC investigation. *See id.* Because the majority fails to defer to the Supreme Court's explicit holding in this regard and instead mistakenly relies upon a prior case of this circuit for a proposition that we have never endorsed, I also cannot join this portion of its opinion.

## III.

Delisle alleges that he suffered retaliation for speaking out on a matter of public concern, namely, "the inner workings of a police department upon which the general public relied upon [sic] for their safety and protection." In order to prove First Amendment retaliation, a plaintiff must show

(1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights.

To demonstrate that [he] was engaging in constitutionally protected speech, [plaintiff] must show that [his] speech touched on matters of public concern, and that [his] interest in commenting upon matters of public concern outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. If the plaintiff can establish the three elements of [his] First Amendment retaliation claim, the burden of persuasion then shifts to the defendants, who must show, by a preponderance of the evidence, that they would have taken the same action even in the absence of the protected conduct.

*Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001) (internal quotations and citations omitted).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). While "the First

Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs," *id.* at 149, it does protect speech regarding any "matter of legitimate public concern," *id.* at 145.

While Delisle may have engaged in protected speech at some point, his complaints were many, and they were almost exclusively about Burgess's management style and Delisle's small raise. Even if he did engage in protected speech, Delisle has not shown that "that the adverse action[s taken against him were] motivated at least in part as a response to the exercise of [his] constitutional rights." *Cockrel,* 270 F.3d at 1048. The Trustees, who upheld the three day suspensions and later demoted Delisle at Burgess's request, were presented with a situation of deteriorating functionality in the management of the Department due to the conflicts between Burgess and Delisle. Though the Trustees understood something of Delisle's complaints about Burgess's proselytizing at work from the EEOC complaint, there is no indication that they demoted him for any other reason than, as one of the Trustees stated, to "put one more layer between [Delisle] and management." with whom Delisle could no longer work effectively.

For the foregoing reasons, I respectfully dissent.