NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0792n.06
Filed: September 14, 2005

No. 04-3920

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LYNN FETERLE,                                          )
                                                      )
    Plaintiff-Appellant,                         )
                                                      )
v.                                                    )  On Appeal from the United States
                                                      )  District Court for the Northern
AMINUR RAJ CHOWDHURY; RUBY L. MARKS; CAROL            )  District of Ohio
CARTWRIGHT,                                            )
                                                      )
    Defendants-Appellees.                        )

Before:    **BOGGS, Chief Judge; GIBBONS, Circuit Judge; and QUIST, District
Judge.**[*]

    **PER CURIAM**. Lynn Feterle appeals from the district court order dismissing his 42

U.S.C. § 1983 claim on summary judgment. He claims that 1) he was denied a name-clearing

hearing in violation of the Fourteenth Amendment, and 2) he was discharged for engaging in speech

protected by the First Amendment. The district court concluded that any requirement for a name-

clearing hearing was satisfied by the numerous internal appeals Feterle pursued within the

University. The court also concluded that Feterle did not suffer an adverse employment action based

on protected First Amendment speech, and that he could not show any causal link between his speech

and the alleged adverse action. We affirm for the same reasons.

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

**I**

Feterle, an Assistant Professor of Aeronautics at Kent State University's School of Technology, filed this 42 U.S.C. § 1983 action claiming violations of his First and Fourteenth Amendment rights in connection with Kent State's decision to terminate his employment. The School of Technology is part of Kent State's regional campus system. He named three defendants: Cartwright (president of Kent State), Chowdhury (dean of the School of Technology), and Marks (director of the Office of Affirmative Action).

Feterle was appointed to the School of Technology's faculty for the 1996-97 school year. At that time, he became eligible to serve a probationary period of up to six years, at the end of which he would be up for tenure. Thus, Feterle would have been eligible for tenure at the beginning of the 2001-02 school year. However, he was not reappointed during the 2000-01 school year, despite the fact that he had been successfully reappointed in the past. According to Feterle, he was not reappointed because Chowdhury unlawfully retaliated against him for exercising his First Amendment rights. Feterle also alleges that he was deprived of his right to a name-clearing hearing in violation of the Fourteenth Amendment. A dispute between Feterle and Chowdhury occurred in August 1999 when Feterle and several others contacted the Vice-Provost for Kent State's regional campus system, Dr. Gordon Keller, and requested an early review of Chowdhury's performance as dean. The request was premised on the allegation that Chowdhury failed to perform his duties adequately. Keller declined to conduct an early review of Chowdhury's performance. Chowdhury was reappointed for the following year.

In April 2000, Feterle and others took a secret vote expressing no confidence in one of

Feterle's coworkers, Dr. Ruth Sitler, who was the coordinator of the aeronautics division. Apparently, Feterle and the others were concerned about Sitler's job performance. Sitler eventually learned of the vote and wrote a memorandum to the University's administration in which she outlined what she perceived to be abuse from her colleagues. In essence, Sitler claimed that she was the victim of a hostile work environment occasioned by Feterle and another faculty member, John Duncan. Later that month, Sitler filed a complaint with the Office of Affirmative Action (the "OAA"), alleging that she suffered hostility based on her gender, age, and race. Marks, as Director of the OAA, investigated the complaint.

In May 2000, Duncan wrote a letter to Cartwright about what he believed were safety issues at Kent State's Airport. This letter eventually led to a request from Chowdhury that Duncan provide facts to support his concerns about the safety issues. Duncan, in response to Chowdhury's request, revealed that he was concerned that Sitler's cognitive abilities were declining. Feterle concurred in the portions of the letter that provided background information and examples of Sitler's allegedly problematic behavior.

In August 2000, after completing a two-month investigation into Sitler's allegations, Marks provided Chowdhury with her conclusions and recommendations (the "OAA Report"). The OAA Report, which is central to the parties' dispute in this matter, found that Sitler had made a prima facie case of discrimination. The OAA had investigated Sitler's allegations of age, race, and gender discrimination, along with her allegations of hostile work environment and found validity to her claims. It also stated that "[s]ome faculty have used the cover of First Amendment rights as a pretext to cover direct evidence of discriminatory behavior on their parts." It also found peculiar the

fact that Sitler's performance had been commended by the University administration, yet denigrated by her peers. In short, the OAA Report found that there was evidence of discrimination, as well as evidence of a hostile work environment. It found that the "egregious examples of hostility" violated Kent State's policy regarding the faculty's code of professional ethics. The OAA Report concluded with several recommendations to remedy the discrimination and eliminate the hostile work environment. The OAA Report did not identify any offenders by name.

In September 2000, Chowdhury sent a letter to the faculty and staff of the School of Technology. The letter served to alert the staff of the specific findings in the OAA Report and to inform them of the recommendations that were listed in the report. The letter stressed the seriousness of this matter and Chowdhury's commitment to resolving these problems. The letter was carbon copied to Provost Paul Gaston ("Gaston" or "Provost Gaston"), Vice-Provost Keller, and an advisory committee comprised of faculty from the School of Technology.

Also in September 2000, the School of Technology Reappointment, Promotion, and Tenure Committee (the "School RPTC") prepared to review Feterle's employment file for reappointment. The School RPTC provided the initial faculty review of a candidate. Chowdhury, as dean, was responsible for providing the School RPTC with the list of persons up for review and instructing the committee on its responsibilities during the review process. Pursuant to University procedure, the candidate up for review must put together the file that the School RPTC is to review. Feterle, in keeping with this procedure, submitted his file to Chowdhury for presentation to the School RPTC. According to Feterle, Chowdhury stated that he would review Feterle's file page-by-page. Feterle also claims that Chowdhury made a statement regarding how Feterle had "tried to get him fired" the

previous year.

Chowdhury placed the OAA Report in the files of both Duncan and Feterle along with several other documents. On September 28, 2000, Chowdhury sent a letter to Vice-Provost Keller stating that he included the OAA Report and other documents in the files of both teachers because of the serious nature of the allegations, and because of Kent State's policy of evaluating employees in terms of whether the person is likely to make a positive contribution to Kent State and its community over the long term.

Feterle was advised of Chowdhury's decision by carbon copy of Chowdhury's letter to Keller. On September 29, 2000, Feterle acknowledged his receipt of Chowdhury's letter to the School and objected to the inclusion of the OAA Report in his reappointment file.

On October 17, 2000, Feterle sent a letter to Vice-Provost Keller. In this letter, Feterle stated he was now aware that the offending material would be included in his reappointment file. He stated that the OAA Report was "untrue, biased, prejudicial, and slanderous . . . ." There is no dispute that Feterle was advised that the OAA Report would be reviewed by the School RPTC in connection with his reappointment. The review process was even temporarily halted at the request of Feterle's union representative. Nevertheless, Feterle chose not to respond to the allegations contained in the OAA Report on the advice of his union.

In late 2000, the School RPTC reviewed Feterle's file and voted against his reappointment. The School RPTC's overall review of Feterle's performance focused on three areas - scholarship of teaching, scholarship of discovery/integration/application, and university citizenship. With respect to scholarship of teaching, the School RPTC noted that there were commendable aspects to Feterle's

teaching, but it also noted that he had not followed up on the School RPTC's previous recommendations that he make a concerted effort to obtain peer reviews and that he integrate more innovative strategies into his teaching.

With respect to the area regarding scholarship of discovery/integration/application, the School RPTC members expressed opinions ranging from "not exceptionally strong" to "relatively weak," and "sufficient." The School RPTC expressed concern in this area because Feterle had again not followed through on prior School RPTC recommendations to put forth more effort into scholarly activities. The School RPTC noted that Feterle's efforts in this area were not strong, but that they were probably at least adequate.

Lastly, in the area of university citizenship, the School RPTC made mention of Feterle's limited work in curriculum, development, advising, and committee work. The members also questioned Feterle's degree of citizenship. Again, they noted that Feterle had failed to follow through on previous recommendations. The School RPTC was also concerned about the OAA Report. Without attempting to determine Feterle's "guilt or innocence," the committee members were bothered by the fact that their deliberations were deferred at Feterle's request, yet he did not respond to the additional material inserted into his file. One member in particular was cognizant of the fact that Feterle may have been cautioned by counsel to not respond, and this member felt that the file should have reflected that fact. The members seemed in consensus that the OAA's findings were not suggestive of an environment that was conducive to congeniality and productivity.

Ultimately, the School RPTC recommended against reappointment, and Chowdhury accepted the recommendation. In a letter to Keller, Chowdhury provided the reasoning of the School RPTC.

Chowdhury's letter to Keller was again provided to Feterle by way of copy. In response to this letter, Feterle requested the opportunity to appeal Chowdhury's decision. In doing so, Feterle outlined what he considered to be procedural and factual errors regarding his reappointment. He provided Keller with those portions of Chowdhury's letter that he felt were misleading, and he set forth his objections. In his nine-page letter to Keller, Feterle clarified his position by denying that he was involved in any discriminatory conduct and claimed that he had attempted to incorporate the School RPTC's recommendations from previous years into his teaching.

Keller sought input from the Regional Campus Reappointment, Promotion, and Tenure Committee ("Regional RPTC"), which is comprised of faculty members from the regional campuses. Feterle also had a meeting with the Regional RPTC to discuss his reappointment. At this meeting, he informed the evaluators that the OAA Report was untrue as it related to him. The Regional RPTC recommended that Feterle be reappointed for another year. This time, the evaluators' comments about Feterle were favorable. For instance, one evaluator found that the OAA Report was sloppy and filled with innuendo. This same evaluator felt that Feterle was denied reappointment on the basis of hearsay. Another evaluator, echoing the same sentiments, found that the OAA Report was poorly written and did not provide specific charges against specific individuals.

Nevertheless, Vice-Provost Keller decided against reappointment. In a letter to Feterle, Keller outlined the basis for his decision. He initially noted that the School RPTC did not give Feterle favorable reviews and he felt that these recommendations carried considerable weight because the assessments came from Feterle's colleagues who worked with him on a day-to-day basis. Keller also outlined the School RPTC's concerns regarding Feterle's disregard of committee

comments from previous years and its concerns about Feterle's limited involvement in other important areas.

Unlike the Regional RPTC, Keller did consider the charges in the OAA Report credible. According to Keller, he had knowledge that Feterle was directly linked to the findings. He admitted that he gave serious consideration to the Regional RPTC's recommendations, but stated that his knowledge of what he considered the "harassing behaviors" Feterle displayed toward Sitler made it impossible for him to recommend reappointment. Keller also informed Feterle that he had the right to include, within five working days, a letter in his file that addressed any procedural errors or other errors of fact. Keller's letter also served to inform Feterle that he had ten working days to appeal the decision to Provost Gaston.

Feterle subsequently sent a letter to Associate Provost Dr. James P. Louis advising Louis of his decision to appeal Vice-Provost Keller's recommendation against reappointment. Feterle also provided Louis with his statement of procedural and factual errors, and he requested that, pursuant to University policy, this statement be included in his file. Louis sent a letter to Feterle acknowledging receipt of his statement and stating that Feterle would be permitted a thirty-minute meeting with Provost Gaston. In a subsequent letter to Gaston regarding his appeal, Feterle denied the allegations in the OAA Report and stated his willingness to respond to the accusations.

On May 2, 2001, Feterle met with Gaston. The primary topic at this meeting was Feterle's academic qualifications. The OAA Report was not discussed because the meeting was limited primarily to academic considerations. Ultimately, Provost Gaston decided against reappointment. In his letter to Feterle advising him of this, Gaston did not mention the OAA Report. Rather, his

reason for deciding against reappointment was based on his opinion that Feterle had "not satisfactorily engaged in scholarship efforts in any form." According to Gaston, Feterle's "understanding of and appreciation for scholarship as defined in Kent State criteria and by consensus within higher education" was inadequate. Gaston informed Feterle of his right to appeal the decision to President Cartwright, or to request a hearing from the Joint Appeals Board (the "JAB"), which would review the matter and then make a recommendation to Cartwright.

Feterle requested a hearing from the JAB. The hearing was held on September 21, 2001. The JAB found that procedural errors occurred in the reappointment process and that those errors had a potentially adverse influence on the outcome of the review. According to the JAB, there were four procedural errors. First, the JAB found that the School RPTC was not appropriately constituted. It found that Duncan, a member of the committee, was not allowed to vote, while another professor who was not a member of the advisory committee was allowed to vote. Second, the JAB found that the School RPTC's chair memo was written before all the votes were in and that some of the committee members appeared to have voted before the meeting was held. Third, the JAB noted that Feterle was not mentioned in the OAA Report and that Chowdhury introduced the report into Feterle's file a mere one day before the committee was scheduled to meet. Further, it noted that there was no documentation that Chowdhury informed Feterle of his right to review the materials added to the file, or that Feterle had the opportunity to include written comments relevant to the material added to his file. Lastly, the JAB found that the School RPTC committee was influenced to some extent by the OAA Report. Ultimately, the JAB recommended that Feterle be reappointed for another year.

Cartwright, however, rejected the JAB's recommendation. In a meeting with the JAB, Cartwright asked the board whether the procedural errors they had identified had any impact on Provost Gaston's decision not to reappoint Feterle based on his academic ability. The JAB told Cartwright that none of the procedural errors they identified affected Gaston's academic judgment of Feterle's ability. In deciding against reappointment, Cartwright found that Gaston had used the appropriate standards in evaluating Feterle's academic performance. She also noted that Gaston had given Feterle an opportunity to meet in person and discuss his academic performance. Despite this fact, as Cartwright noted, Gaston had determined that Feterle's academic accomplishments were insufficient. Cartwright also noted Gaston's determination that Feterle had not "exhibited a stable pattern of performance that fell within the range of activities constituting positive University Citizenship." Ultimately, Cartwright found nothing arbitrary or capricious in Gaston's reasoning, and she found no evidence that Feterle was prejudiced by the procedural errors the JAB identified.

With respect to the OAA Report, Cartwright noted that the JAB failed to identify any procedure that was violated by the inclusion of the report in Feterle's file. Moreover, she noted that the JAB failed to show how the OAA Report influenced Gaston's decision, which was made on the basis of Feterle's academic abilities and contained no mention of the report. Cartwright concluded by noting that Provost Gaston's decision was premised on Feterle's academic abilities only and that it was conducted in accordance with the appropriate academic standards. She noted that "[n]othing in the record indicates that [Feterle was] deprived of a full and fair review of [his] qualifications for reappointment, or established that the Provost's decision was arbitrary and capricious."

After receiving notice of Cartwright's decision, Feterle filed a grievance under the Collective

Bargaining Agreement, and a two-day arbitration hearing was held. The substance of the OAA

Report was not addressed, but the process afforded to Feterle during his reappointment process was.

The arbitrator's ultimate conclusion was that no prejudicial procedural error had occurred in the

reappointment process and affirmed Cartwright's decision to not reappoint Feterle.

On August 15, 2002, Feterle initiated this suit. He brought two causes of action: a First

Amendment claim against Chowdhury in his individual capacity and claim that he was denied his

Fourteenth Amendment right to a name-clearing hearing. The district court granted summary

judgment for the defendants on both claims on June 17, 2004.

## II

We review the grant of a motion for summary judgment *de novo*, taking facts in the light

most favorable to the non-moving party. *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 543-44 (6th Cir.

2003). "Summary judgment is appropriate when there are no genuine issues of material fact in

dispute and the moving party is entitled to judgment as a matter of law." *Bridgeport Music, Inc. v.*

*Dimension Films*, 410 F.3d 792 (6th Cir. 2005).

## III

Feterle argues that his Fourteenth Amendment rights were violated because he did not

receive a name-clearing hearing.[1]  It is well established that a person's reputation and good name

---

[1]He makes this claim as a §1983 claim against Cartwright, Chowdury, and Marks in their official capacities. The district court also noted that the complaint was unclear, but treated Feterle's complaint as making a Fourteenth Amendment claim against Chowdhury in his individual capacity as well. Feterle, however, explicitly states in his brief to this court that he is not making a Fourteenth Amendment claim against Chowdury in his individual capacity. App. Br. at 41.

are among the liberty interests protected by the Due Process Clause of the Fourteenth Amendment from damage by public government action in connection with a termination of employment or refusal to rehire. *Paul v. Davis*, 424 U.S. 693, 707-08 (1976); *Kendall v. Board of Ed. of Memphis City*, 627 F. 2d 1, 5 (6th Cir. 1980). Accordingly, the Supreme Court has determined that where a nontenured government employee shows he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name. *Codd v. Velger*, 429 U.S. 624, 627-28,(1977) (per curiam). "A name-clearing hearing is required only when a nontenured public employee is dismissed from his or her job and publicly stated reasons that reflect on the terminated employee's honesty or integrity are relied upon, either explicitly or implicitly." *Ferencz v. Hairston*, 119 F.3d 1244, 1250 (6th Cir. 1997).

Assuming, arguendo, that Feterle was entitled to a name-clearing hearing, his claim nonetheless fails because Feterle in fact received numerous hearings sufficient to satisfy the requirements for a name-clearing hearing. A name-clearing hearing requires only that an employee be provided with notice and the opportunity to clear his name and "need not comply with formal procedures to be valid." *Chilingirian v. Boris*, 882 F.2d 200, 206 (6th Cir. 1989) (finding that name-clearing hearing was adequate where employee had only the opportunity to rebut charges at the hearing despite the council's refusal to answer questions submitted by the employee). *See also Gregory v. Hunt*, 24 F.3d 781, 788-89 (6th Cir. 1994) (finding that name-clearing hearing was adequate where employee was allowed to speak at an informal hearing and later to submit a written response to the allegations against him). The only real requirement for a name-clearing hearing is

the opportunity to be heard; to address the charges against you.

Feterle received a number of hearings, each of which independently satisfied the minimal requirements for a name-clearing hearing:

1.  The School RPTC (which initially considered whether to reappoint Feterle).  Feterle was informed that the School RPTC would consider the OAA Report.  Proceedings were delayed while Feterle was given the opportunity to respond.  Feterle chose not to respond, he says, because his union advised him not to.

2.  Vice-Provost Keller and the Regional RPTC (Feterle's first appeal).  Feterle responded to the OAA Report and concerns about his scholarship  in writing to Keller, and met with the RPTC to rebut the OAA Report.

3.  Provost Gaston (next appeal).  Feterle provided a written statement addressing the OAA Report and other issues, and was also given a 30-minute meeting with Provost Gaston to discuss his concerns.

4.  Kent State President Cartwright and the JAB (final appeal within the University).  Again, Feterle was permitted to submit a written response.  He also received a hearing before the JAB to address his concerns.

5.  The arbitration.  There was a two-day arbitration hearing at which Feterle presented his arguments.

At each of these stages,  Feterle was informed of complaints that may have related to him  and was given the opportunity to rebut them.  Thus, each hearing/appeal provided Feterle with the essential elements of a name-clearing hearing – the opportunity to address the complaints against him.

Feterle's main response is to argue that due process was not satisfied because he was not given the names of his accusers and the witnesses who provided the information in the OAA report. Reply Br. at 8-10.  Feterle does not, however, identify any case law suggesting that such information is required.  Indeed, in *Chilingirian*, 882 F.2d at 206, we specifically found that the council's refusal to answer questions from the employee at the name-clearing hearing did not violate due process.

Feterle also relies upon the collective bargaining agreement, which he argues requires the University to name his accusers. But the collective bargaining agreement cannot be the source of constitutional due process rights.[2] At bottom, the level of process required for a name-clearing hearing is quite low, and each of the five hearings/appeals provided Feterle crosses this low hurdle.

## IV

Feterle's second claim is that he was terminated in retaliation for exercising his First Amendment rights. Specifically, he identifies the following protected speech as having spurred retaliation: 1) participation in a secret no-confidence vote concerning his colleague Sitler, 2) requesting that Keller review Chowdury's work performance as Dean, 3) raising safety concerns relating to the Kent State University airport to Assistant Dean Scott Layton , and 4) questioning Chowdury's hiring of a spouse of a member of the University's Board of Trustees to Layton.

The First Amendment protects government employees' right to speak out on matters of public concern without reprisal from their employer. *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1185 (6th Cir. 1995). To prove a claim of retaliation in violation of the First Amendment, an employee much establish:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Farmer v. Cleveland Public Power*, 295 F.3d 593, 599 (6th Cir. 2002). Furthermore, as this is a

---

[2]Feterle's reading of the collective bargaining agreement seems somewhat strained, and at best would support an action for breach of contract.

claim against Chowdhury in his individual capacity, Chowdhury will be protected by qualified immunity "unless he knew or should have known that his conduct violated clearly established rights." *Dominque v. Telb*, 831 F.2d 673 (6th Cir. 1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815-19 (1982)).

Like the district court, we conclude that Feterle's First Amendment claim failed because Feterle's speech was not constitutionally protected speech and also because Feterle could not establish causation. We therefore need not reach the question of qualified immunity for Chowdhurry.

## A

It is well established "that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983) (finding that questionnaire distributed by a employee addressing confidence in supervisors, employee moral, and other grievances was not protected speech). "The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern." *Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir. 1988) (finding that employee's speech concerning mismanagement is not protected speech). *See also Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) (finding that letters to a supervisor complaining about police chief's leadership are not protected speech). In short, complaining about your boss and

coworkers is not protected by the First Amendment just because you work for the government.

We conclude that Feterle's speech was not protected by the First Amendment. The fact that Feterle's speech was entirely internally directed, as opposed to informing the public, weighs against First Amendment protection. *See Connick*, 461 U.S. at 148 (finding it relevant that the plaintiff "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities"). All of his concerns about airport safety came in the context of complaints about Sitler's poor job performance (memory lapses, confusion, etc.) and Chowdhury's management decisions (hiring staff, obtaining new airplanes, etc.). Feterle raised these safety concerns only to amplify what are at bottom complaints about job performance. We have held that complaints about police management are not transformed into statements of public concern merely because police are charged with securing the public safety and, thus, poor management could harm public safety. *See Brown*, 867 F.2d at 322. Likewise, we conclude that complaining about the poor management of an airport and university is not a matter of public concern when those complaints are directed only to other government employees and concern the employee's supervisors and coworkers.

**B**

To establish causation Feterle offered two pieces of evidence: first, temporal proximity. Feterle's complaint against Chowdhury was more than a year before the OAA Report was inserted into his file, and the most recent complaints about Sitler's competence were four months old at that point. The district court was correct to conclude that this is not meaningful temporal proximity. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (finding that discharge four months after filing discrimination claim was insufficient to establish prima facia case of

retaliatory discharge).  Second, Feterle claims that Chowdhury told him "you know, you tried to get me fired last year" when Feterle turned in his reappointment file,[3] and that this creates an issue of material fact with respect to causation.

Feterle, however, cannot establish that the insertion of the OAA Report – even if motivated by animus – caused him to be denied tenure.  The two final decision-makers in the appeals process were Provost Gaston and President Cartwright.  Both made their evaluations of Feterle based purely on his scholarly work.  When Gaston met with Feterle, it was to discuss his scholarly work and Gaston subsequently stated that his decision was based on an evaluation of Feterle's scholarship.  The University JAB concluded that Gaston's evaluation of Feterle's scholarship was proper, and President Cartwright (the final decision-maker) approved Gaston's decision based strictly on the evaluation of Feterle's scholarship.  Feterle has presented no evidence to suggest that this is pretextual, either directly or by showing that similarly situated individuals were treated differently.

**V**

For the foregoing reasons, we **AFFIRM** the summary judgment granted by the district court in favor of the defendants.

---

[3]This allegation was not made by Feterle until an affidavit two years after the alleged statement was made.  At no point during his various appeals within the University system, did Feterle claim that Chowdhury made this statement.