NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0280n.06
Filed: April 26, 2006

No. 05-3015

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHAPLAIN WILLIAM AKRIDGE | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| | ) | |
| REGINALD A. WILKINSON, ALAN J. | ) | O P I N I O N |
| LAZAROFF AND BOBBY J. BOGAN, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

_____

Before: DAUGHTREY and GILMAN, Circuit Judges; RUSSELL, District Judge[*]

**RUSSELL, District Judge.** Chaplain William Akridge appeals the district court's order

granting summary judgment in favor of Defendants Reginald A. Wilkinson, Alan J. Lazaroff and

Bobby J. Bogan on his First Amendment-based retaliation claim, as well as his federal due

process claim. Chaplain Akridge appeals the district court's holdings on retaliation and due

process, as well as its alternative holding that the Defendants were entitled to qualified

immunity. For the following reasons, we **AFFIRM** the judgment of the district court.

_____

[*]Honorable Thomas B. Russell, United States District Judge for the Western District of
Kentucky, sitting by designation.

1

# I. BACKGROUND

Plaintiff Akridge has worked as a chaplain for the Ohio Department of Rehabilitation and Correction ("ODRC") since 1996. In April of 2002, he was assigned to the Madison Correctional Institution (MCI), where he was the full-time chaplain until being transferred after the events giving rise to this case. Akridge, an ordained minister of the American Baptist Churches, was employed as a Protestant minister. Defendant Reginald Wilkinson was the director of the ODRC, Defendant Alan Lazaroff was the warden at MCI, and Defendant Bobby Bogan, Jr. was the deputy warden of special services at MCI. Mr. Bogan was Akridge's immediate supervisor, and Mr. Bogan reported to Mr. Lazaroff. Akridge named Defendant Wilkinson in his official capacity only, and the other two defendants in both their official and individual capacities. Akridge alleges that defendants Lazaroff and Bogan unconstitutionally retaliated against him for refusing to allow an openly gay inmate to lead a choir or praise band that was scheduled to participate in Protestant services at MCI. He further alleges that the disciplinary action constituting the retaliation (a fine of two days' pay) was a due process violation because the regulations on which it was allegedly based were unconstitutionally vague.

Akridge was assigned to "Zone A" inmates at MCI, a large percentage of whom were sexual offenders. Prior to Akridge's arrival at MCI, an inmate choir that had previously taken part in the Protestant services was disbanded, apparently due to infighting. It had been replaced by an inmate "praise band," which was led by an inmate named Hatfield. About six months after Akridge arrived at MCI, Hatfield approached him and told him that another group of inmates, led by an inmate named Reed, had taken the musical instruments and was planning to play at the

2

service. Akridge told Reed that he did not object to a new band, but that the band members needed to approach him first for permission to play at the service. Akridge apparently told inmate Reed that his concern was that the group might play "pagan music;" Akridge did not know at that time that Reed was openly gay. Reed then became confrontational with Akridge, telling Akridge that he believed Akridge was discriminating against him because he was gay. Akridge responded: "I didn't know you were gay. But since you tell me you are gay, then that is reason enough for you not to ... lead the band." (J.A. 134-35).

Thereafter, on October 24, 2002, Reed filed a complaint with Bogan alleging that Akridge was discriminating against him on the basis of his sexual orientation. Bogan contacted Akridge by telephone on October 31 to discuss the complaint, and Akridge told Bogan that he was not allowing Reed to lead the choir because Reed was a practicing homosexual. (J.A. 160). Akridge also prepared a written response to Reed's complaint in a memo to Reed dated November 4, 2002. (J.A. 75). On November 5, Bogan conducted an investigatory interview with Akridge in person, along with a union representative. (J.A. 59). Bogan then ordered Akridge to allow Reed to "have an opportunity to be one of the choir directors." (J.A. 266). Akridge refused to do so, and on November 12, 2002, Lazaroff issued a notice for a pre-disciplinary conference to be held before a Labor Relations Officer on November 19, 2002. (J.A. 76). The notice informed Akridge that he was being charged with insubordination for his refusal to comply with Bogan's order. (*Id.*). After the conference, Akridge sent to the Labor Relations Officer a written list of "arguments" that he felt he had not had the opportunity to present orally. (J.A. 77). On November 20, 2002, Lazaroff fined Akridge two days' pay. (J.A. 98). Thereafter, Akridge was voluntarily transferred to a different corrections institution within

3

the ODRC.

## II. STANDARD OF REVIEW

This court reviews *de novo* a district court's award of summary judgment. *Barrett v. Harrington*, 130 F.3d 246, 251 (6th Cir. 1997). Summary judgment is proper if the evidence submitted shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court must view the entire record in the light most favorable to the non-moving party. Smith v. Chrysler Corp., 155 F. 3d 799, 804 (6th Cir. 1998).

## III. ANALYSIS

### A. The nature of Akridge's speech

As an initial matter, Appellant argues that the district court misconceived the nature of his claim in that it misidentified the speech upon which his claims are predicated. Appellant argues that his "refusal to place Inmate Reed in a position of leadership in the Protestant congregant worship service" constitutes speech protected by the First Amendment. (Appellant's Brief, at 27).

The district court's opinion does address this argument, though it also discusses other speech by Akridge related to the issue, including his written and oral statements in the course of the disciplinary procedures as well as his statements directly to Reed. As to the initial statements by which Akridge denied Reed the opportunity to lead the musical portion of the services, the district court said that Akridge

> was not commenting on the social or legal ramifications of homosexuality in
> general. His statements occurred in the limited context of a decision he made

4

> within the scope of his employment as chaplain. Plaintiff's personal opinions on whether the Protestant faith condemns homosexuality as a sin, regardless of their validity, do not constitute matters of public concern. Plaintiff's views on whether permitting Reed, a homosexual, to participate in the prison services in a leadership capacity would be sending a message to other inmates of tolerance or accpetance of homosexuality incompatible with the Protestant faith and plaintiff's own beliefs do not involve matters of public concern. The 'point' or 'focus' of the statements was simply to explain and defend to his superiors his decision not to permit Reed to participate as a choir leader or band member in the services, and to establish the bounds of his authority as chaplain. Plaintiff's statements concerning his views on Reed's participation in the services in a leadership role and his refusal to permit Reed's participation were made to further a private purpose, that being plaintiff's own agenda as to how the services at MCI should be conducted.

(J.A. 38-39). With regard to the statements made by Akridge in response to Bogan's order, the district court held that they were "not a comment by Plaintiff as a citizen, but rather a comment made in his role as chaplain ... [P]laintiff was defending his authority as chaplain and arguing that his decision on a matter within the scope of his employment should predominate over the policy decisions of his supervisor on that same matter. These are internal employment matters, not a subject of public concern." (J.A. 39). Similarly, as to Akridge's written response to the insubordination charge, the district court held that it did not address a matter of public concern. (J.A. 40). Therefore, Appellant's assertion that the district court failed to address the speech upon which his claim was based is incorrect.

Another of Akridge's principal arguments before this court is that the district court mischaracterized the nature of the speech that Akridge asserts is protected by the First Amendment. Akridge argues that his complaint is properly read as alleging that the act of refusing to permit Reed to lead the choral group is expressive conduct entitled to First Amendment protection under the Supreme Court's decisions in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) and *Boy Scouts of America v. Dale*,

5

530 U.S. 640 (2000).  Before this court, the Defendants concede that "[a]t least in the context in which it occurred ... Akridge's conduct in refusing to instate Reed ... constituted 'speech' within the meaning of the First Amendment."  (Appellee's Br. at 26).  We need not discuss this issue further, however, because we agree with Defendants and the district court that, even if Akridge's conduct is speech, and even if that speech did address a matter of public concern, the *Pickering* balancing test weights against Akridge in this case.  *See infra* Part B.

Appellant next argues that the district court mistakenly held that the speech in question was not on a matter of public concern.  He analogizes his speech, which he argues was on "matters related to homosexuality discrimination" (Appellant's Brief, at 34), to speech on racial discrimination, which he claims was held by the Supreme Court in *Connick v. Myers* to inherently implicate matters of public concern.  461 U.S. 138, 148, n. 8 (1983).  In that footnote, the *Connick* court was summarizing the holding of *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693 (1979).  (*Connick* itself did not involve racial discrimination.)  Also, he analogizes the speech to that held by this court to be on a matter of public concern in *Cockrel v. Shelby County School District*.  270 F.3d 1036 (6th Cir. 2001).

In *Cockrel*, a public school teacher was dismissed due in part to her decisions to include in her curriculum lessons about the environmental benefits of industrial hemp.  *Id.* at 1046.  There, we said that "so long as the speech relates to matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest,' it shall be considered as touching upon matters of public concern."  *Id.* at 1052, *quoting Connick*, 461 U.S. at 146-49, 103 S.Ct. 1684.  A better analogy to Chaplain Akridge's speech in the case at bar, however, would be the analysis used in a "mixed speech" case, which the *Cockrel* court describes but rejects for that

6

case. 270 F.3d at 1052, n.5. "In mixed speech cases, the employee at issue speaks not only as both a citizen and an employee, but the content of her speech involves both matters of public and private concern." *Id.*, *citing Bonnell v. Lorenzo*, 241 F.3d 800, 811-12 (6th Cir. 2001). Here, Akridge's speech clearly contains elements of private concern (specifically, arguments about his authority as chaplain to make final decisions about the worship services at MCI) but also contains elements that, according to the reasoning in *Cockrel*, are of public concern.

The *Cockrel* court, in addition to citing the district court opinion on the question of whether industrial hemp was a matter of public concern, looked to the issue's appearance in local news and discussion by politicians to support the conclusion that it was. 270 F.3d 1051-52. Similarly, a debate about the propriety of homosexuality has been the subject of news reports and discussion by politicians on the local and national level. Where the speech in question is mixed speech, "if any part of an employee's speech, which contributes to the [adverse employment action], relates to matters of public concern," the analysis must proceed to the next step: the balancing analysis required by the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 411 (6th Cir. 1994).

### B. The *Pickering* balancing test

In its opinion, the district court held in the alternative that, even if Akridge's statements were on matters of public concern, the *Pickering* test weighed against affording them First Amendment protection. (J.A. 46). The *Pickering* test, as the *Cockrel* court described it, requires that "public employee speech, even if touching on matters of public concern, will not be constitutionally protected unless the employee's interest in speaking on these issues outweighs

7

the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 270 F.3d at 1053 (internal quotation marks and citation omitted).

The district court identified essentially two categories of interests of the defendants: the interests in preventing the discrimination inherent in Akridge's conduct and the interests in enforcing discipline among its employees. As to the first, it noted several facts that indicate (though not conclusively) that the ODRC maintains a policy of non-discrimination on the basis of sexual orientation when dealing with inmates. (J.A. 41). Even without such a policy, however, the district court noted that possible constitutional concerns (specifically, free exercise claims) would also legitimately motivate the ODRC to strictly limit actions regulating an inmate's religious practice. (J.A. 41-42). Relatedly, the district court noted that Lazaroff believed that "it was bad penology to exclude an inmate from a program simply because of a characteristic such as sexual orientation, thereby creating tensions among the prison population." (J.A. 42). The district court rejected Akridge's counter-arguments on the grounds that (1) "no evidence has been presented in this case that inmate Reed posed any kind of security threat which would warrant barring his participation as a choir leader or band member," and (2) "there is no evidence that Reed's participation as a leader of the choir or as a band participant would interfere with the free exercise rights of other inmates." (J.A. 43-44). The district court also noted an earlier Sixth Circuit case in which this court held that "an inmate who alleged that a chaplain denied the inmate the right to participate in religious services due to the inmate's homosexuality stated a claim under § 1983, and reversed the district court's grant of summary judgment in favor of the inmate." (J.A. 42).

8

As to the interests in enforcing discipline among employees, the district court cited our decision in *Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000), for the proposition that "maintaining employee accountability is a legitimate organizational interest." (J.A. 44). In that opinion, the court quoted the earlier case of *Meyers v. City of Cincinnati*, which held as follows:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline. *Rankin* [*v. McPherson*], 483 U.S. [378] at 388 [1987], 107 S.Ct. [2891] at 2899; *Pickering*, 391 U.S. at 570-573, 88 S.Ct. at 1735-1737. As in *Rankin*, we look for evidence of the impact of the statement on the city's legitimate organizational interests.

934 F.2d 726, 730 (6th Cir. 1991). The district court held that Akridge's statements "did not meaningfully interfere with the performance of his duties, create disharmony among co-workers or destroy any relationship of loyalty and trust required of confidential employees." (J.A. 45). However, it also held that the statements undermined legitimate interests of the ODRC; namely, the interests in preventing the discrimination inherent in Akridge's actions and the consequences thereof (Reed's complaints, possible § 1983 liability, etc.). (*Id.*). The district court dismissed Akridge's argument that his statements did not impair discipline because no disciplinary situation existed before Bogan's intervention, stating that

> [t]his [argument] ignores the fact that plaintiff admittedly disobeyed a direct order by his supervisor. There is no evidence that Bogan or Lazaroff manufactured or colluded in the complaint filed by Reed which triggered Bogan's inquiry and the later disciplinary proceedings. The fact that the defendants decided not to pursue plaintiff's continued insubordination any further was due to the fact that plaintiff transferred to another institution soon thereafter. This does not diminish the threat which plaintiff's actions posed to the ordered administration of the institution and its policies.

(J.A. 46).

9

For these reasons, the district court said, "the balance tips in favor of the defendants on the *Pickering* scale." (*Id.*) On appeal, Akridge argues that "the ODRC has no interest whatsoever in whether there even exists an inmate choir leader" and that, because the regulations delegate primary responsibility for making such determinations to the chaplain, his speech does not undermine a legitimate goal of the ODRC. (Appellant's Brief at 42). The district court addressed these issues in its opinion, noting the interest in preventing discrimination and the supervisory relationship between Chaplain Akridge and Bogan and Lazaroff. Although it may be that Akridge could have disbanded the choir and/or praise band entirely, the facts appear to be that he did not do so; rather, he openly and intentionally excluded an inmate from such groups (indeed, this is the basis for his claim that his speech was on a matter of public concern). Even if the ODRC had no interest in the *existence* of the band, this would not vitiate its interest in preventing discrimination and its consequences. Akridge's arguments on the district court's application of the *Pickering* test, then, are unavailing.

### C. Vagueness of the ODRC's anti-discrimination policy

Akridge also seeks to have the ODRC's anti-discrimination policy declared void for vagueness. This request arises in the context of his claim that he suffered a denial of due process. As the district court noted in its opinion, however, Akridge was not disciplined for a violation of the anti-discrimination policy; rather, he was disciplined for insubordination. (J.A. 52). As the district court further noted, Akridge does not allege that the insubordination policy was unconstitutionally vague or that, had the anti-discrimination policy been clearer, he would have acted differently. (J.A. 53). The district court's denial of Akridge's due process claim was not error.

10

**D. Qualified immunity**

The district court alternatively held that the individual defendants, Bogan and Lazaroff, were entitled to qualified immunity from suit for their actions in this case. (J.A. 51-52). The district court identified the test for qualified immunity in a First Amendment retaliation case as follows: "...if an employer in the position of the defendants at the time of the adverse job action, measured objectively, could have disagreed as to (1) whether and to what extent the speech was a matter of public concern, and (2) where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest, then the protection of qualified immunity should be granted." (J.A. 50-51, *citing Guercio v. Brody*, 911 F.2d 1179, 1184 (6th Cir. 1990); *Moran v. State of Washington*, 147 F.3d 839, 850 (9th Cir. 1998)). Akridge argues that reasonable employers could not disagree about either of these elements; however, even if the *Pickering* test did weigh in favor of Akridge, it would not be clear enough to prevent the defendants from being entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to the Defendants on all of Akridge's claims.

11