**Paul WAY, Plaintiff,**

v.

**SHAWNEE TOWNSHIP,
et al., Defendants.**

**Case No 3:14CV2504**

United States District Court,
N.D. Ohio, Western Division.

Filed June 20, 2016

Romin Iqbal, Columbus, OH, Fazeel S. Khan, Blaugrund, Herbert & Martin, Worthington, OH, for Plaintiff.

David A. Riepenhoff, Frank D. Hatfield, Fishel Hass Kim Albrecht, Columbus, OH, for Defendants.

## ORDER

James G. Carr, Sr. U.S. District Judge

This is a civil-rights action for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Ohio Civil Rights Act, O.R.C. § 4112 *et seq.*, and 42 U.S.C. § 1983.

Plaintiff Paul Way alleges defendants Shawnee Township, Ohio (Township) and Todd Truesdale, Fire Chief of the Shawnee Township Fire Department (Department), retaliated against him for complaining about alleged discriminatory practices and cultural bigotry in the Department. Way also alleges defendants retaliated against him for exercising his right to free speech under the First Amendment of the United States Constitution.

I have jurisdiction under 28 U.S.C. §§ 1331, 1367.

Pending is defendants' motion for summary judgment. (Doc. 17). Finding it to be without merit, I deny the motion.

### Background

Way began working for the Township as a full-time firefighter in May 1999 after interviewing with several Township and Department representatives, including Truesdale. (Doc. 14-9 at 29-30). Over the next approximately seven years, Way received two promotions: the first, to Captain in January 2003; the second, to Platoon Chief in June 2006. (*Id.* at 30-31).

When Way joined the Department all its firefighters were, like Way, white males. (Doc. 20-1 ¶ 7). According to Way, that situation did not change throughout his thirteen years in the Department.[1] (*Id.* ¶ 8). Way testified he considered that unusual based on his experiences at other fire departments. (*Id.* ¶ 7).

---

1. Truesdale testified that during his tenure as Fire Chief, he hired eight white males and one male minority, but no females. (Doc. 14-6 at 160-61).

More unusual, and, he claims, shocking to him, was the common practice of firefighters giving Truesdale, then a Platoon Chief, a Nazi salute when they saw him and referring to him as "Hitler." (Doc. 14-10 at 146-47; Doc. 20-1 ¶ 10). Photographs show firefighters engaging in this conduct in the station, in public areas, at fire sites, on the fire truck, during training and at Department social events.[2] (Doc. 20-1 ¶¶ 11-12; Doc. 20-2). Firefighters even gave Truesdale the Nazi salute in the presence of Township Trustees (Trustees). (Doc. 14-10 at 347).

The use of homophobic slurs also was routine in the Department. (Doc. 20-1 ¶ 13; Doc. 14-6 at 115-16). For example, such slurs often appeared on birthday cakes for firefighters. (Doc. 20-1 ¶ 14; Doc. 20-2 at 7, 10, 18). Truesdale himself often referred to Way as a "faggot," though he knew Way's son was gay. (Doc. 14-10 at 175-77).

At the time, the Department did not provide training to employees, new or old, on workplace discrimination and harassment. (Doc. 14-9 at 43-46, 65-66; Doc. 20-1 ¶9; Doc. 14-6 at 60-62, 65-66, 69-70, 82). Way therefore concluded such behavior was part of the Department's accepted culture. (Doc. 14-10 at 147). After some time, it even became normal to him.[3] (Id. at 147-48). As Way testified, "[e]verybody else was doing it—that was the culture, you are not going to go against it or you are going to be ostracized and you are not going to last."[4] (Id. at 171).

Way claims he began to have misgivings about the culture in 2011 when he became responsible for rewriting the Department's Standard Operating Procedures. (Doc. 14-10 at 148). Around that time, Way was taking online business courses from Columbia Southern University, and was learning about discrimination in the workplace. (Doc. 14-9 at 54-55, 57; Doc. 20-1 ¶ 15). He started to realize that the discriminatory practices and cultural bigotry he had observed and, indeed, in which he had actively joined, could have dire consequences for the Department. (Doc. 14-10 at 148). He therefore started voicing concerns to Truesdale. (Id. at 205).

At first, because Way and Truesdale were friends at the time, "it mainly started out just in conversations." (Id. at 249). For example:

> We could be talking about anything, and [I would say], "Hey, man, we got to think about changing this. This could be a problem in the future." After a while, nothing was done. It was normally, "Leave it alone. I'll handle it." Well, it never got handled. It never got taken care of. It never got addressed.

(Id.).

Other times, Way would say to Truesdale:

> "Hey, man, you know what's going to happen if the wrong person walks in this place and sees these pictures," or "You know sooner or later we're going to have a female, you know that." And that was it. It was just simple conversations, didn't even get mad. "Leave it alone.

---

**2.** According to Way, Truesdale took many of these photographs himself. (Doc. 14-10 at 217-18).

**3.** Defendants point to several examples of how Way himself participated in the Department's culture of multi-targeted bigotry. (Doc. 17 at 1-3). For example, defendants allege Way often engaged in racist, sexist, anti-Semitic, and homophobic "humor," and regularly mocked Truesdale's age and weight. (Id.).

**4.** Defendants claim the alleged discriminatory conduct and cultural bigotry occurred, and ended, before Truesdale took over as Fire Chief in February 2009. (Doc. 14-6 at 73; Doc. 17 at 5-6). Whether that is so or not, the firefighter roster remained all male and predominantly all white.

We'll take care of it. Don't worry about it. We'll change it."

(*Id.* at 213).

Over time, Way voiced his concerns more aggressively. (*Id.* at 249). He complained specifically about, *inter alia,* the lack of female dorms and separate female shower areas, firefighters giving the Nazi salute, photographs on display in the Department kitchen showing firefighters giving the Nazi salute, and birthday cakes decorated with homophobic slurs, swastikas and a model holocaust crematorium.[5] (*Id.* at 197-99, 202, 206). He argued the work environment discriminated against women, homosexuals, "Blacks" and "Jewish people," and could create legal problems for the Department. (*Id.* at 197-99, 202, 206).

Way asserts Truesdale was "dismissive" of his concerns. (Doc. 20 at 6). According to Way, Truesdale typically responded that such complaints were "not productive," that he did not "want anybody else to know about it," and that "this could cause division in the department,"[6] (*Id.* at 198). He advised Way, "you need to let it go," and "let it roll off your back." (Doc. 14-9 at 62-63).

Nevertheless, Way continued his complaints into 2012. (Doc. 14-10 at 213).

On July 10, 2012, Way and two other Platoon Chiefs received a reprimand for "continued negative bantering by electron-ic communication"[7] in violation of the Department's new policy regarding off-duty electronic communication.[8] (Doc. 21-1 ¶ 17; Doc. 20-11 Exs. D, E, F). The next day, Way sent an email to those same Platoon Chiefs expressing his intent to seek legal advice regarding the legitimacy of the reprimand. (Doc. 20-4).

On August 2, 2012, the Trustees, after consulting with Truesdale, placed Way on administrative leave pending an investigation into his conduct.[9] (Doc. 14-7 at 192; Doc. 20-5). Truesdale provided Way with a list of fourteen infractions, one of which was the July 10, 2012 incident that led to his reprimand. (Doc. 20-5).

On August 13, 2012, Way, accompanied by counsel, appeared for a pre-disciplinary hearing. (Doc. 20-7). The hearing officer, a local attorney, found that except for one "technical violation"—the statement by Way to the other Platoon Chiefs that he intended to seek legal advice after the reprimand—Way's alleged infractions were unfounded. (Doc. 20-7). The hearing officer "did not find that they were serious violations which exposed the [Department] or any persons in the general public to risk." (Doc. 20-7).

On August 18, 2012, Way renewed his complaints about discriminatory practices and cultural bigotry in the Department in a letter addressed to another Platoon Chief. (Doc. 20-1 ¶ 16; Doc. 14-9 at 137;

---

**5.** Way himself contributed a watch case to fashion the model, but he claims he did not know that was its intended use. (Doc. 20-1 ¶ 17).

**6.** Similarly, when Way asked Truesdale about applying for a grant for recruitment of minorities to the Department, Truesdale replied "were not going to do that," and "we're going to focus on other things." (Doc. 14-10 at 157, 158, 248).

**7.** Defendants attribute Way's "negative bantering" to his dissatisfaction with not receiv-ing a promotion to Assistant Fire Chief when that position opened up in September 2011. (Doc. 17 at 6; Doc. 14-11 Ex. C).

**8.** The policy prohibited, *inter alia,* "[c]omments or displays which impact members' abilities to perform their job duties or the [Department's] ability to maintain an efficient workplace." (Doc. 14-11, Ex. F at 2).

**9.** The Township, not the Fire Chief, is the appointing authority vested with the power to hire, discipline, and terminate Department employees. (Doc. 17-1 ¶ 1).

Doc. 14-11, Ex. Z). He testified he delivered it a few days later to either the Platoon Chief or a representative of his union, the International Association of Firefighters (Union).[10] (Doc. 14-9 at 137; Doc. 14-10 at 143, 247, 248).

On September 6, 2012, Truesdale and the Trustees "collectively" decided to demote Way two ranks to that of an entry-level firefighter.[11] (Doc. 14-7 at 223-25). Although only the Trustees had the authority to demote Way (Doc. 17-1 ¶ 1), Truesdale admits he was involved in the decision. (Doc. 14-7 at 223-25). The Trustees could have given Way a lighter punishment, but chose not to.[12] (Id.).

Following his September 6 demotion, Way claims he began to suffer from severe stress and anxiety. (Doc. 21-1 ¶ 18). Five days later he sought treatment from a psychiatrist, Dr. Michael Koval. (Doc. 14-10 at 234-37). Way explained his workplace environment and its psychological impact on him. (Id.). Dr. Koval scheduled an appointment with Way for the following morning, and advised him not to go to work that day. (Doc. 14-10 at 238). Following that advice, Way called in sick for September 12, 2012. (Doc. 14-9 at 99).

After meeting with Way, Dr. Koval diagnosed him with Acute Stress Disorder (DSM-IV code 308.3). (Doc. 20-10). Dr. Koval certified him to be off work for both that day and September 14, 2012, his next scheduled work day. (Doc. 14-10 at 239; Doc. 20-9).

On his way home from Dr. Koval's office, Way stopped for lunch at a local sports bar. (Doc. 20-1 ¶ 19). He had a beer with his lunch. (Doc. 14-11, Exs. S,T). Way went to the same bar for lunch on September 14, 2012—this time having two beers. (Id.).

Truesdale learned that Way had been at the bar, drinking beer, on both days. He told the Trustees; they, in turn, appointed an investigator to look into the matter. (Doc. 14-7 at 244-45, 251, 253). They also placed Way on administrative leave pending the outcome of the investigation. (Doc. 20-1 ¶ 28).

On September 21, 2015, Way wrote a second complaint letter. (Doc. 14-11, Ex. Y). In it, he asserted, "I strongly believe that your recent actions against me were motivated by personal issues rather than the charges you levied against me in the pre-disciplinary conference." (Id.). He also again expressed concerns about discriminatory practices and cultural bigotry in the Department. (Id.).

Way hand delivered the letter to the secretary of the Department. (Doc. 20-1 at 128-31; Doc. 20-11). He included four copies in four separate envelopes, one copy for each Trustee and one copy for Truesdale. (Doc. 14-9 at 128-31; Doc. 20-11).[13]

---

**10.** Truesdale claims never to have seen this letter until after this lawsuit began. (Doc. 14-6 at 132-33).

**11.** Way filed a grievance contesting his demotion under the Township's Collective Bargaining Agreement (CBA) with the Union. (Doc. 14-11, Ex. N at 2). The Trustees denied the grievance. (Id. Ex. O). The Union determined not to take Way's demotion to arbitration as permitted under the CBA. (Doc. 14-9 at 91).

**12.** The only other Department employee to have been demoted in the previous twenty years had physically assaulted a colleague. (Doc. 14-7 at 226-27; Doc. 20-17 Nos. 14, 15; Doc. 14-4 at 39-40).

**13.** In response to Way's letter, on September 24, 2012, Truesdale "reissued" to all employees the Department's policies and procedures regarding discrimination and harassment in the workplace. (Doc. 17 at 9; Doc. 14-11, Ex. LL; Doc. 17-1 ¶ 13; Doc. 17-3 ¶ 14). The Department conducted training regarding those policies and procedures shortly thereafter. (Id.).

On October 18, 2012, Truesdale and the Trustees held a pre-disciplinary hearing claiming Way "fraudulently, dishonestly, inappropriately, and falsely used sick leave by engaging in recreational and/or social activities while on sick leave." (Doc. 14-7 at 274-75; Doc. 20-12). Way, accompanied by counsel, appeared for the hearing. (Doc. 14-7 at 272; Doc. 20-13).

The hearing officer, the same attorney who presided over Way's first pre-disciplinary hearing, found no fraudulent or dishonest intent on Way's part at the time he requested sick leave. (Doc. 20-13 at 3). The hearing officer did, however, find that while "the sick leave commenced with a valid reason ... the subsequent conduct negated the validity of the sick leave." (*Id.*).

Specifically, the hearing officer concluded that Way had violated paragraph (A)(4) of the Department's Personnel Policy and Procedure Manual, which provides:

An employee is also prohibited from participating in recreational or social activity until the employee has returned to work if the activity is inconsistent with the employee's absence from work, or if the activity shows that the employee is capable of working. While on sick leave, an employee is expected to remain at home during the hours of the day during which the employee would otherwise be on duty so that, if necessary, the employee may be contacted by the Employer.

(Doc. 14-11, Ex. Q, ¶ 4).

After the hearing, and after discussions with Truesdale, the Trustees terminated Way on December 11, 2012.[14] (Doc. 278-79; Doc. 20-15).

Way then filed a discrimination/retaliation claim with the Equal Employment Opportunity Commission (EEOC). (Doc. 20-16). In its determination, the EEOC noted:

[T]here is reasonable cause to believe that *per se* violations have been found under Title VII of the Civil Rights Act of 1964, as amended, with respect to [the Township's] failure to address [Way's] notice of discriminatory practices and cultural bigotry in regards to Nazi propaganda, saluting, and other anti-Semitic activities performed by management and members of the Department.

(Doc. 20-16).

Accordingly, the EEOC issued Way a "Right to Sue" letter. (*Id.*). On November 13, 2014, Way filed this action. (Doc. 1).

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs.,*

14. Way filed a grievance contesting his termination under the CBA. (Doc. 14-11, Ex. X). The Trustees denied the grievance, and the Union determined not to take Way's grievance to arbitration. (Doc.14-9 at 121).

*Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## Discussion

As noted, Way asserts claims of 1) retaliation in violation of Title VII and Ohio's anti-discrimination laws, and 2) retaliation for exercising his constitutional right to free speech. I address the Title VII and state-law claims first.

### A. Retaliatory Discharge

Title VII prohibits an employer from retaliating against an employee who has either 1) "opposed any practice made an unlawful employment practice by [Title VII]," or because 2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).

■ As to Way's claims in this case, the "Ohio Civil Rights Act mirrors Title VII in all relevant respects."[15] *Lindsey v. Whirlpool Corp.*, 295 Fed.Appx. 758, 760 (6th Cir.2008). Thus, I analyze his "claims exclusively under a Title VII analysis, with the understanding that [Way's] success or failure in establishing a right to relief under Title VII necessarily would entail the conclusion that his claims must either succeed or fail under Ohio law as well." *Id.* (citations omitted); *see, e.g., Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir.2008) ("[Plaintiff] raises claims of . . . discrimination under both Title VII and section 4112 of the Ohio Revised Code. Those federal and state claims may be analyzed together, however, because 'Ohio's requirements are the same as under federal law.' ") (citation omitted).

Where, as here, a plaintiff bases his Title VII retaliation claim on circumstantial evidence,[16] I apply the burden-shifting framework established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (*McDonnel Douglas* framework applies "when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse employment action").

Under *McDonnel Douglas*, the burden is first on the plaintiff to make his *prima facie* case. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir.2009). It then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions. *Id.* Finally, the burden shifts back to the plaintiff to show pretext—i.e., that the employer fabricated its explanation to conceal an illegal motive. *Id.*

■ "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation omitted).

---

**15.** There is one significant difference between Title VII and the Ohio Civil Rights Act as they apply to this case. Under Title VII, a plaintiff may not hold an individual supervisor liable. *E.g., Wathen v. General Elec. Co.*, 115 F.3d 400, 404–05 (6th Cir.1997). On the other hand, under the Ohio statute, a supervisor may be personally liable for discriminatory conduct. *E.g., Genaro v. Central Transport*, 84 Ohio St.3d 293, 300, 703 N.E.2d 782 (1999). Thus, while Way cannot hold Truesdale personally liable under Title VII, he can do so under Ohio's statute.

**16.** None of Way's allegations amount to direct evidence of discriminatory intent. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements made by non-decision makers, or statements by decision makers unrelated to the decisional process itself [cannot] suffice to satisfy the Plaintiff's burden [of] demonstrating animus.").

■ To prove a *prima facie* case of Title VII retaliation, Way must show:

1) [he] engaged in activity protected by Title VII; 2) this exercise of protected rights was known to defendant; 3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by the supervisor; and 4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cty. Fiscal Court,* 201 F.3d 784, 792 (6th Cir.2000).

■ The burden of proving a *prima facie* case in retaliation cases is "not onerous." *Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir.2013).

Way has met his initial burden.

Way satisfies the first two elements of his *prima facie* case because he engaged in protected activities that were known to defendants. It is undisputed that throughout 2011 and 2012, before Way's demotion and subsequent termination, he verbally complained to Truesdale about discriminatory practices and cultural bigotry in the Department.[17] Those complaints were far from vague, as defendants argue. *See, e.g., Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793–94 (S.D.Ohio 1998) ("Complaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity."). He identified specific discriminatory practices and conduct—Nazi salutes and imagery, the "Hitler" nickname, homophobic slurs, etc.—and even voiced his concern that those activities could create legal problems for the Department.[18]

The fact that Way made these verbal complaints to Truesdale, and not to the Trustees, is inapposite. Truesdale, not the Trustees, was in charge of the Department. He, as Chief, not the Trustees, was duty-bound to make sure that the rank and rancid bigotry—and *all* its vestiges and influence—that had pervaded his Department no longer existed. It was entirely appropriate for Way to direct his complaints to Truesdale.[19] *See Driggers v. City of Owensboro,* 110 Fed.Appx. 499, 510 n. 4 (6th Cir.2004) (oral complaint of discrimination to supervisor satisfies protected ac-

---

**17.** There is no evidence that either Truesdale or the Trustees saw Way's August 18, 2012 complaint letter before this lawsuit.(Doc. 14-6 at 132-33). Accordingly, the sending of that letter was not a protected activity known to defendants.

**18.** I agree with defendants that to state a claim for retaliation, Way must show he had a good faith, reasonable belief that the activities he complained of were unlawful. *See, e.g., Harper v. Blockbuster Enter. Corp.,* 139 F.3d 1385, 1388 (11th Cir.1998). I do not agree, however, that Way's past participation in those activities shows, as a matter of law, he lacked such a belief when he registered his complaints. Way's state of mind at the time he spoke out is a factual question for the jury. *See Stukey v. United States Air Force,* 790 F.Supp. 165, 170 (S.D.Ohio 1992) (question of fact arises when state of mind at issue in discrimination case). It is up to a jury to determine whether his decision no longer to swim in the sewer or tolerate any lingering stench was *bona fide* or not.

**19.** Defendants assert that the complained of conduct had ended by the time Way voiced his concerns. That, however, is a question of fact for the jury. The record shows, in any event, that photos indicative of anti-Semitism remained on the kitchen wall. It also shows those photos only came down sometime around August 2012 after a firefighter's wife complained about their display. (Doc. 14-10 at 144-45; Doc. 20-3). A jury could find that, even if there were no more Heil Hitler "greetings" or other overt expressions of bigotry and bias, a discriminatory mindset continued to infect the Department. A jury could also find that Truesdale, at the very least, tolerated, and thereby implicitly endorsed, that situation by failing to take the photos down himself.

tivity element of retaliation claim); *Delisle v. Brimfield Twp. Police Dep't*, 94 Fed. Appx. 247, 255 (6th Cir.2004) (informal complaint of discrimination is protected activity).

In any event, it is undisputed the Trustees became aware of Way's concerns after receiving his September 21, 2012 complaint letter. In it, he detailed the same discriminatory practices and cultural bigotry about which he had often verbally complained to Truesdale. He also stated that those activities."are not only morally wrong, but may actually have legal implications for the township and the department." (Doc. 14-11, Ex. Y at 2). Clearly, the Trustees knew Way had engaged in a protected activity before they terminated him.

Way also satisfies the third element of his *prima facie* case. He suffered two adverse employment actions after he lodged his complaints: demotion, followed by termination.

As for the fourth element, Way must prove a causal connection "according to traditional principles of but-for causation, which requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (internal quotation marks omitted).

In August 2012, Truesdale and the Trustees cited Way for fourteen infractions, all but one of which the hearing officer deemed unfounded. Based on that one infraction—which the hearing officer characterized as a mere "technical violation" of Departmental policy—the Trustees and Truesdale "collectively" decided to demote Way two levels from Platoon Chief to entry-level firefighter. It was only the second demotion in the Department in twenty years, and the first based on non-violent conduct. (Doc. 14-7 at 226-27; Doc. 20-17 Nos. 14-15; Doc. 14-4 at 39-40).

Given these facts, a reasonable jury could conclude that Truesdale's discriminatory animus—borne out of Way's persistent complaints—so infected the Trustees' decision-making process that they would not have demoted Way but for Truesdale's influence. *See Goodsite v. Norfolk Southern Ry. Co.*, 573 Fed.Appx. 572, 586 (6th Cir.2014) (employer may be liable under "cat's paw" theory of liability if "the decisionmaker relied on discriminatory information from the biased supervisor").

Similarly, no Department employee ever had been terminated for violating the sick leave policy. (Doc. 20-17 Nos. 12, 13; Doc. 20-18 ¶¶ 5-6; Doc. 14-9 at 109-12; Doc. 14-4 at 38-39). To be sure, Truesdale's predecessor as Fire Chief punished a sick-leave policy violation with a simple reprimand. (Doc. 20-18 ¶¶ 5-6).

Defendants cite *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992), to argue that I should not compare punishments unless both employees, *inter alia*, "dealt with the same supervisor" and were therefore "similarly situated." Since *Mitchell*, however, the Sixth Circuit has emphasized that it has "never held that an equivalence of supervisors was *required* to establish similarity." *Gibson v. Shelly Co.*, 314 Fed.Appx. 760, 771 (6th Cir.2008) (emphasis in original). Rather, "the plaintiff and the employee with whom the plaintiff seeks to compare himself ... must be similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (emphasis in original; internal quotation marks omitted).

A reasonable jury could therefore conclude that but for discriminatory animus emanating from Truesdale, and possibly felt by the Trustees, Way would not have lost his job for his violation of the sick-leave policy, but instead would have received a lesser penalty—*e.g.*, a repri-

mand.[20] *See Bishop v. Ohio Dept. of Rehabilitation and Corrections*, 529 Fed.Appx. 685, 698 (6th Cir.2013) ("When an adverse ... decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.").

In sum, Way has alleged facts sufficient to establish the fourth element of his *prima facie* case. *See Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir.2007) ("The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.").

■ Notwithstanding Way's *prima facie* showing, defendants claim they should prevail because they had legitimate, nondiscriminatory reasons for demoting and later terminating Way. They argue that "a Title VII plaintiff alleging retaliation *cannot* establish liability if [his] firing was prompted by both legitimate and illegitimate fac-

tors." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, — U.S. —, 133 S.Ct. 2517, 2546, 186 L.Ed.2d 503 (2013) (Ginsburg, J., dissenting). A trier of fact could find, however, that those reasons were mere pretext, especially considering Truesdale's desire to maintain the status quo and keep discriminatory practices and cultural bigotry in the Department under wraps. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir.2008) (plaintiff may offer evidence that "sheds light on whether the employer's proffered reason for the employment action was its actual motivation").[21]

Accordingly, Way's Title VII and state-law retaliation claims survive summary judgment.

## B. First Amendment Retaliation

Way also alleges defendants unlawfully retaliated against for him for exercising his constitutional right to free speech.

■ Section 1983 provides a remedy for constitutional violations committed by state actors. Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional

---

**20.** The fact that the investigation into Way's alleged misuse of sick leave was already underway when the Trustees and Truesdale received his September 21, 2012 complaint letter is irrelevant. The adverse employment action was not the investigation itself, but the punishment that resulted, which occurred on December 11, 2012, shortly after the Trustees and Truesdale received the letter. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000) ("Although no one factor is dispositive in establishing a causal connection, evidence ... that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.").

**21.** A jury could take into consideration, in evaluating the *bona fides* of the defendants' facially legitimate explanation, whether the initial fourteen charges manifested animus-based overkill that taints the alleged *bona*

*fides* of their decision to impose the drastic sanction of termination. Given the animosity that the record shows developed between Truesdale and Way, a rational jury could also find that retaliatory animus on his part played, in fact, the determinative role in that outcome, even despite the hearing officer's finding of misconduct. What role Truesdale played, and what influence he had on the Trustees (particularly if any of those who made the decision were among those who had earlier witnessed the Nazi salute) is a crucial fact that only a jury can determine. A jury could find, in effect, that, though the blunderbuss almost completely misfired, retaliatory animus provoked the defendants to go gunning for Way again after he, albeit foolishly, made himself a target. The fact that the defendants had not in the past taken the same "shot" in similar circumstances is also something that could affect the jury's assessment of pretext.

torts if a desire to punish an individual for exercise of a constitutional right is the motivation. *See, e.g., Board of County Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (non-renewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.").

■ Employer retaliation is generally not a valid claim under Section 1983. *See Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1205 (6th Cir.1984). An exception exists, however, for First Amendment retaliation by public employers. *See Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 168 (6th Cir.2004) ("[A]rguably the First Amendment to the Constitution independently protects a government employee from retaliation for complaints about discriminatory employment practices, which are a matter of public concern.")

■ It is well established that a government employer cannot "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). As a logical consequence, retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation. *See Zilich v. Longo,* 34 F.3d 359, 365 (6th Cir.1994). This is the case even if the employee could have been terminated for any reason. *See Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

■ To prevail on a First Amendment retaliation claim, a plaintiff must first establish his *prima facie* case. *Perry v. McGinnis,* 209 F.3d 597, 604 (6th Cir. 2000). If a plaintiff is able to do so, the burden shifts to the defendant to show "that it would have reached the same decision ... even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Unlike the burden-shifting framework that applies to Title VII claims, if the defendant meets its burden of showing that the employment decision would have been the same even in the absence of the protected conduct, the burden does not shift back to the plaintiff to demonstrate pretext. *Eckerman v. Tennessee Dept. of Safety,* 636 F.3d 202, 208 n. 4 (6th Cir.2010).

The Supreme Court has established a three-pronged test for determining whether a plaintiff has established a *prima facie* case of First Amendment retaliation. Under the test, commonly called the *Pickering* test, *see generally Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the plaintiff must set forth three elements: 1) the speech involved a matter of public concern, *see Connick,* 461 U.S. at 143, 103 S.Ct. 1684; 2) the interest of the employee "as a citizen, in commenting upon matters of public concern," outweighs the employer's interest "in promoting the efficiency of the public services it performs through its employees," *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; and 3) the speech was a substantial or motivating factor in the denial of the benefit sought. *See Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568.

Way has met his initial burden.

■ As a threshold matter, whether speech addresses a matter of public concern is a question of law, *Williams v. Com. of Kentucky,* 24 F.3d 1526, 1532 (6th Cir.1994), "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,*

461 U.S. at 147–48, 103 S.Ct. 1684. To conclude that speech addresses a matter of public concern, "this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412 (6th Cir.1994).

■ Discriminatory practices and cultural bigotry are "inherently" matters of concern to the community. *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir.2000) (citing *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684); *see Akridge v. Wilkinson*, 178 Fed.Appx. 474, 479 (6th Cir.2006) (homosexuality discrimination matter of public concern); *Delisle v. Brimfield Twp. Police Dept.*, 94 Fed.Appx. 247, 257 (6th Cir.2004) (religious discrimination matter of public concern); *Warren v. Ohio Dept. Of Public Safety*, 24 Fed.Appx. 259, 267 (6th Cir. 2001) (racial and sexual discrimination matter of public concern).

Defendants appear not to dispute that conclusion. Instead, they contend that because Way made his complaints privately, they necessarily were not matters of concern to the public. (Doc. 17 at 21-23; Doc. 21 at 17-18). That argument misses the mark, as the Supreme Court's decision in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), makes clear. There, the Court established that an employee's choice to communicate privately with an employer does not strip the concern of its public nature. *Id.* at 415–16, 99 S.Ct. 693 ("Neither the [First] Amendment itself nor [Supreme Court] decisions indicate that [freedom of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

Likewise, in *Perry*, the Sixth Circuit rejected the argument that, because the plaintiff brought his race discrimination complaint in the context of an internal grievance with his employer, the complaint did not address a matter of public concern. 209 F.3d at 608. The court noted that the fundamental distinction is between "matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives."[22] *Id.* (citing *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 575 (6th Cir.1997)). Accordingly, "whether [plaintiff's] racial discrimination complaint was borne out of civic-minded motives or of an individual employment concern is irrelevant. What is relevant is that the subject of [plaintiff's] complaint was racial discrimination—a matter inherently of public concern, according to the Supreme Court." *Id.* at 608–09 (citing *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684).

Thus, the fact that Way never communicated his complaints to the public does not render them "individual employment concerns" rather than public concerns.[23]

---

**22.** Defendants argue Way's "speech, regarding being on paid administrative leave for [fifty] days, [and] other 'recent actions' against him ... are personal and not a matter of public concern." (Doc. 21 at 17). While I agree that "[c]ontroversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection," *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1187 (6th Cir.1995), "the employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does so." *Rahn*, 31 F.3d at 412 (citing *Connick*, 461 U.S. at 146–49, 103 S.Ct. 1684)).

**23.** Defendants cite *Feterle v. Chowdhury*, 148 Fed.Appx. 524, 533 (6th Cir.2005), to argue that the fact that Way's speech was "entirely internally directed, as opposed to informing the public, weighs against First Amendment protection." But *Feterle* does not apply here. In that case, plaintiff's speech was "at bottom complaints about job performance." *Id.* "[C]omplaining about your boss and coworkers is not protected by the First Amendment

Way's speech was therefore protected.

Having made that determination, I must weigh and balance Way's protected speech against defendants' interest in "performing their function efficiently." *Leary v. Daeschner*, 349 F.3d 888, 899–900 (6th Cir. 2003).

Way made his complaints in a non-disruptive manner. He first spoke to Truesdale informally in private conversations. When his verbal complaints failed to cause any change, he wrote a letter (dated September 21, 2012) to Truesdale and each of the Trustees. He never voiced his concerns to other Department employees. Viewing the facts in the light most favorable to Way, his protected speech did not interfere with the orderly and efficient operation of the Department. *See Delisle*, 94 Fed.Appx. at 258 (balance tips in favor of employee where speech occurred solely between officer, police chief and township trustees).[24]

In the final step of the analysis, I must determine whether Way presented sufficient evidence to create a genuine issue as to whether his protected speech was "a substantial or motivating factor" in his adverse employment events. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Ordinarily, causation is a question of fact for the jury. *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir.1997). I see no reason to deviate from that approach here. Way's evidence that his protected speech motivated his demotion and subsequent termination is "more than a scintilla" and suffices to survive a motion for summary judgment. *Leary*, 349 F.3d at 900–02.

Way therefore has established his *prima facie* case.

Of course, defendants argue that they would have demoted and terminated Way even if he had not spoken out. (Doc. 21 at 19). A jury might find that so. I cannot find, however, that "*every* reasonable trier of fact would conclude that [defendants] would have [demoted and] terminated Way even in the absence of his speech." *Galli v. Morelli*, 277 F.Supp.2d 844, 858 (S.D.Ohio 2003) (emphasis added).

A jury could find, for example, that Way's discipline was so anomalous and so disproportionate to the gravity of his violation of the sick leave policy—which, unquestionably, exposed neither the Department nor the public it serves to any risk of harm—that it is not reasonable to believe defendants would have taken the same actions without Way's vocal behavior. *See Leary*, 349 F.3d at 903 ("Because a genuine issue of material fact still exists with respect to the reason for Plaintiff's [employment event], whether Plaintiff's [employment event] would have occurred in the absence of the protected speech also requires further proceedings."); *Williams v. Com. of Kentucky*, 1997 WL 561369, *5 (6th Cir.) (affirming denial of summary judgment in retaliation case where the evidence "was not so one-sided as to warrant judgment as a matter of law").

Accordingly, summary disposition of Way's First Amendment retaliation claim is inappropriate.

### C. Qualified Immunity

Finally, defendants argue Truesdale is entitled to qualified immunity.

---

just because you work for the government." *Id.* On the other hand, complaining about workplace discrimination—as Way did here—is protected. *See Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684.

**24.** In any event, defendants' complaint that the plaintiff did not go public rings a tad

hollow: would they really have preferred that he had done so before, rather than (as he did) after his firing? Would they really have been happier if he had called the media without ever having expressed his concerns to his then friend Truesdale?

■ Qualified immunity is not a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Instead, the doctrine, when applicable, precludes suit entirely. *Id.* The doctrine has this effect so government officials need not undergo the burdens of discovery and trial. *Id.*

In *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir.2009), the Sixth Circuit summarized the doctrine of qualified immunity and related principles:

> Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.
>
> Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. Plaintiff must show both that, viewing the evidence in the light most favorable to [him], a constitutional right was violated and that the right was clearly established at the time of the violation. If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, [he] will have failed to carry [his] burden.

(Citations and internal quotation marks omitted).

■ In short, to decide whether a government official is entitled to qualified immunity a court must determine whether 1) plaintiff has shown the official violated a constitutional right, and 2) if so, the constitutional right was "clearly established" when he or she did so. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

■ Summary judgment based on qualified immunity is not appropriate if there are factual disputes or genuine issues of material fact "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir.1992).

■ Here, construing the evidence in Way's favor, I cannot find that Truesdale is entitled to qualified immunity. If the jury accepts Way's allegations as true, there can be no dispute that 1) Truesdale violated Way's constitutional right to free speech by convincing the Trustees to demote and later terminate him in retaliation for his complaints, *see Bishop*, 529 Fed. Appx. at 698, and 2) Way's right to free speech was "clearly established" when Truesdale did so. *See Mack v. Holcomb*, 446 F.Supp.2d 777, 788 (N.D.Ohio 2006) (Carr, J.) ("The employee's interest in making allegations concerning racial discrimination is great and would be obvious to any employer.") (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 585 (6th Cir.2000)).[25]

25. Believing firmly that Truesdale has no plausible basis for asserting qualified immunity, I urge the Circuit Court, if he takes a fruitless appeal on that basis, to impose an appropriate sanction for the delay such appeal will cause to this case reaching finality, and the expense plaintiff will incur in defense against such challenge.

Questions of fact therefore exist as to Truesdale's entitlement to qualified immunity.

### Conclusion

Because genuine issues of material fact exist as to Way's claims, summary judgment is not warranted.

It is therefore

ORDERED THAT defendants' motion for summary judgment (Doc. 17) be, and the same hereby is, denied.

So ordered.